T.C. Memo. 1998-218


UNITED STATES TAX COURT


THEODORE LANGWORTHY, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13395-96.                    Filed June 22, 1998.


<u>Jack M. Battaglia</u> and <u>Bernadette Weaver-Catalana</u>, for

petitioner.

<u>Jerome F. Warner</u> and <u>Matthew I. Root</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined the following

deficiencies in, additions to, and penalty onpetitioner's Federal

income tax for the years 1987, 1988, 1989, and 1990:[1]

---

[1]  Respondent's trial memorandum concedes a decreased
deficiency for 1987 and asserts increased deficiencies for 1988,
1989, and 1990.  As petitioner has raised no objection to the
                                        (continued...)

| | | Additions to Tax | | | | Penalty |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b) | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6661 | Sec. 6663 |
| 1987 | $32,177 | - | $24,133 | [1] | | $8,044 |
| 1988 | 26,326 | $19,745 | - | - | 6,582 | - |
| 1989 | 27,199 | - | - | - | - | $20,399 |
| 1990 | 11,624 | - | - | - | - | 8,718 |

[1] 50 percent of the interest due on the deficiency.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues to be decided are as follows:

(1) Whether the assessment and collection of taxes, additions to tax, and penalties for 1987, 1988, and 1990 are barred by the period of limitations pursuant to section 6501(a) or are allowed under either (a) the fraud exception to the general period of limitations provided in section 6501(c)(1) or (b) the extended 6-year period of limitations provided in section 6501(e)(1)(A); and

(2) if assessment and collection are not barred for 1987, 1988, and 1990, then, for each of those years and for 1989 we must decide whether:

(a) and, if so, to what extent, petitioner omitted

[1](...continued)
increased deficiencies, the issues relating to such increased deficiencies appear to have been tried by consent. Rule 41(b)(1). We, however, do not address the increased deficiencies because the decision we reach below results in deficiencies less than those determined by respondent in the notice of deficiency.

gross receipts from his tavern business during the years in issue;

(b) petitioner is entitled to deduct certain business expenses in excess of the amount allowed by respondent for the years in issue;

(c) petitioner is liable for additions to tax for fraud under section 6653(b)(1)(A) and (B) for 1987 and under section 6653(b) for 1988;

(d) petitioner is liable for penalties for fraud under section 6663 for 1989 and 1990; and

(e) petitioner is liable for additions to tax for substantially understating income tax under section 6661 for 1987 and 1988.

## FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case. Petitioner resided in Jamestown, New York, at the time he filed his petition. Petitioner filed timely Federal income tax returns (returns) for all years in issue.

Background

During the years in issue, petitioner owned and operated the Bullfrog Hotel (Bullfrog) in Jamestown, New York. The Bullfrog, located on the Chautauqua River in the industrial section of Jamestown, consists of a 22-room hotel and a tavern. The

Bullfrog's clientele, generally workers from the surrounding factories, is characterized as a boilermaker crowd.[2] Open 7 days a week, the Bullfrog serves food, soft drinks, and alcoholic beverages including beer, wine, and liquor. The Bullfrog employed three individuals during the years in issue: Petitioner, Jim Malbaum (Mr. Malbaum), and Dorothy Stacey (Ms. Stacey). Petitioner manages all aspects of the hotel and tavern, and he works there approximately 80 to 85 hours each week. Until his retirement during 1990, Mr. Malbaum's duties included sandwichmaking and bartending. Ms. Stacey worked part time at the Bullfrog for 11 years, waiting on tables during the lunch hour rush (11 a.m. to 2 p.m.), 5 days a week. Although her primary duty was waitressing, Ms. Stacey occasionally filled in as a bartender on nights that the Bullfrog had a band. Two to three nights per week, usually on those band nights, Ms. Stacey frequented the bar as a patron.

Petitioner failed to report all of his beer, wine, and liquor purchases during the years in issue. Petitioner's failure to report all of his purchases led to criminal charges for willfully filing false returns in violation of section 7206(1). On May 15, 1995, petitioner entered into a plea agreement, agreeing to plead guilty to one count of violating section

---

[2]     At the Bullfrog, a boilermaker is a shot of whiskey with a beer chaser on the side.

7206(1) relating to the years 1988, 1989, and 1990.[3]  On August 25, 1995, the U.S. District Court for the Western District of New York, on the basis of petitioner's guilty plea, held petitioner guilty of one count of violating section 7206(1).

Invoices from the Bullfrog's vendors (vendor invoices), when compared to purchases reported on petitioner's returns (reported purchases), demonstrate that petitioner failed to report purchases of $39,228, $42,787.80, $48,060.90, and $13,620.32 for 1987, 1988, 1989, and 1990, respectively (unreported purchases). Reported purchases were paid for by checks drawn on the Bullfrog's account at Marine Midland Bank, and unreported purchases were paid for by cash drawn from the cash register.[4] Petitioner kept no record of his unreported purchases, and he failed to advise his return preparer, Michael Dillon (Mr. Dillon), of the unreported purchases.[5]  Petitioner failed to report the gross receipts generated by the sale of the unreported

---

[3]     The plea agreement, dated May 15, 1995, stated the following factual basis for petitioner's plea of guilty:

> The defendant failed to report substantial cash purchases of beer, liquor, and wine on his federal income tax returns for the 1988, 1989, and 1990 tax years.  The defendant knew the amounts stated on his tax returns as expenses were not accurate.  The defendant signed the aforementioned federal income tax returns under penalty of perjury, knowing the returns falsely stated the amount of expenditures for beer, liquor, and wine.

[4]     Petitioner ordered and paid for all of the inventory purchased for the Bullfrog.

[5]     The parties agree, however, that petitioner's reported purchases are not in dispute.

purchases (unreported gross receipts), and petitioner kept no records of the unreported gross receipts. At the time petitioner filed his returns for the years in issue, he knew that the unreported purchases and the unreported gross receipts were not reported on his return.

Mr. Dillon, of Acme Tax Service, prepared petitioner's returns for the years in issue solely from the information provided by petitioner, which included cash register receipts, check stubs, cash payouts, a payroll book, a weekly rental book, and bank statements.

Unreported Gross Receipts

Using the beer, wine, and liquor purchases indicated on the vendor invoices, the drink prices charged by petitioner for sales of those beverages, and allowing an adjustment for discretionary use (i.e., breakage, spillage, and complimentary drinks), respondent reconstructed petitioner's total gross receipts. From total gross receipts respondent subtracted reported gross receipts to arrive at the amount of petitioner's unreported gross receipts.

1.   Purchases

Vendor invoices indicate the following purchases:[6]

---

[6]   During 1988, 1989, and 1990, petitioner purchased Bartyles and James brand wine coolers. Respondent did not include the
                                          (continued...)

| Item Purchased | Quantity Purchased | | | |
|---|---|---|---|---|
| | 1987 | 1988 | 1989 | 1990 |
| Kegs of beer[1] | 151 | 227 | 249.5 | 231.5 |
| Bottled beer (cases)[2] | 5,579 | 4,824 | 4,879 | 2,600 |
| Canned beer (cases)[2] | 732 | 668 | 616 | 1,217 |
| Liquor: | | | | |
|   Liter bottles[3] | 1,114 | 1,658 | 2,087 | 1,140 |
|   .750-liter bottles[4] | 60 | 79 | 12 | 9 |
| Wine: | | | | |
|   Liter bottles[3] | 167 | 142 | 269 | 181 |
|   .750-liter bottles[4] | 23 | 25 | 60 | 143 |
|   3-liter bottles | 24 | 12 | – | – |
|   1.5-liter bottles | – | 96 | 42 | 42 |

[1]A keg of beer contains either 198 10-ounce or 165 12-ounce glasses of beer. The average cost of a keg of beer was $23.13 during 1987, $23.30 during 1988, $25.61 during 1989, and $26.20 during 1990.

[2]Each case contains 24 bottles or cans of beer. During April 1990, petitioner began purchasing loose cans of beer; before that time canned beer was purchased in six-packs bound with plastic (i.e., four six-packs per case).

[3]There are 33.5 ounces in each liter bottle of wine or liquor.

[4]There are 25.13 ounces in each .750-liter bottle of wine or liquor.

2.   Beer, Wine, and Liquor Sales

Throughout the years in issue, petitioner sold, for on-premises consumption (over the bar), (1) draft beer in 10-ounce glasses for 50 cents per draft, (2) bottled beer for $1.10 per bottle, (3) wine for $1.10 per glass, and (4) liquor for $1.15 per drink. Petitioner also sold kegs and six-packs of beer for off-premises consumption (to go). To-go kegs were sold to local

[6](...continued)
sale of these wine coolers in the reconstruction of petitioner's gross receipts for the years in issue.

softball teams for postgame parties and to individuals for private parties, picnics, and weddings. To-go six-packs were generally sold at closing time and on weekends to patrons and hotel guests. Petitioner kept no records of the number of to-go kegs or six-packs he sold. Petitioner rang up none of his to-go keg sales and only some of his to-go six-pack sales.

Respondent's reconstruction of gross receipts from the sale of keg and canned beer made no allowance for to-go sales of kegs and six-packs. Respondent's computation of gross receipts from the sale of wine and liquor was based on a determination that each wine drink sold contained 4 ounces of wine, and that each liquor drink sold contained 1 ounce of liquor.

### 3. Discretionary Use Percentage

Respondent reconstructed petitioner's gross receipts from the sale of each keg of draft beer assuming sales of 165 12-ounce glasses per keg which allows approximately 17 percent for discretionary use. Reconstructed gross receipts from the sale of bottled and canned beer were adjusted to reflect an 8.3-percent discretionary use allowance (i.e., two bottles or cans per case). Into the reconstruction of gross receipts from the sale of wine respondent factored a discretionary use allowance of 20 percent

for each .750-liter bottle, 1.5-liter bottle,[7] and 3-liter
bottle[8] and an allowance of 40 percent for each liter bottle.
Gross receipts from the sale of liquor were calculated using 16
percent as the discretionary use allowance.

Petitioner kept no record of the number of beer, wine, or
liquor drinks given away, and he did not keep records of broken
or spilled drinks (beer, wine, or liquor).

4.   Reconstructed Gross Receipts

In the deficiency notice, mailed on April 1, 1996,
respondent determined that petitioner had gross receipts for
1987, 1988, 1989, and 1990 in the amounts of $256,344, $242,740,
$249,378, and $199,199, respectively.  Respondent's computations,
as stipulated by the parties,[9] indicate reconstructed gross
receipts from the sale of draft beer, bottled beer, canned beer,
wine, and liquor in the amounts of $204,076.50 for 1987,
$209,167.85 for 1988, $223,325.45 for 1989, and $150,639.60 for

---

[7]    Each 1.5-liter bottle of wine contains the equivalent of two
.750-liter bottles.

[8]    Each 3-liter bottle of wine contains the equivalent of four
.750-liter bottles.

[9]    Calculations were stipulated for trial, for respondent and
petitioner, respectively, solely for the purpose of showing how
the parties calculated gross receipts.  Neither party stipulated
the accuracy, correctness, or reasonableness of the other party's
calculations.

1990.[10]  Petitioner's computations, as stipulated by the parties,
indicate gross receipts from the sale of draft beer, bottled
beer, canned beer, wine, and liquor in the amounts of $167,715.73
for 1987, $169,321.93 for 1988, $178,809.03 for 1989, and
$122,014.47 for 1990.

   5.   Reported Gross Receipts

        The parties stipulated reported gross receipts
from the sale of beer, wine, and liquor of $84,179.57 for 1987,
$73,801.36 for 1988, $73,865.70 for 1989, and $104,254.74 for
1990.[11]

Expenses

   1.   Band Expenses

   Country western, rock and roll, rock and roll blues,
fifties, and sixties style bands regularly played at the
Bullfrog.  Petitioner hired bands directly and through David
Blackburn (Mr. Blackburn), a local entertainment agent.  When

---

[10]   We note that the deficiency notice indicates gross receipts
in amounts greater than those shown in respondent's stipulated
computations.  The difference, we assume, is that gross receipts
as determined in the deficiency notice include sales of food and
soft drinks.  As respondent made no argument concerning food and
soft drink sales at the Bullfrog, any issues relating to such
sales appear to have been conceded.  Rybak v. Commissioner, 91
T.C. 524, 566 (1988).

[11]   Petitioner's returns reflect reported gross receipts in
excess of the amounts stipulated for trial.  Petitioner reported
gross receipts of $131,448, $121,149, $121,483, and $157,613 for
1987, 1988, 1989, and 1990, respectively.  The difference, we
assume, is that petitioner's reported gross receipts included
sales of food and soft drinks which are not in issue in the
instant case.

bands played at the Bullfrog, they typically played on Thursday, Friday, and Saturday nights. Petitioner customarily paid the bands in cash following each performance.

Bands featured at the Bullfrog were regularly advertised in Nite-Line Magazine (Nite-Line), a local entertainment guide. Petitioner advertised in Nite-Line 44 weeks during 1987, 48 weeks during 1988, 39 weeks during 1989, and 44 weeks during 1990. Available back copies of Nite-Line demonstrate that, during the years in issue, petitioner regularly listed three band nights (typically Thursday, Friday, and Saturday) in each advertisement.[12] Nite-Line records indicate that petitioner incurred band advertising expenses of $1,596, $1,740, $1,416, and $1,596 during 1987, 1988, 1989, and 1990, respectively.

Petitioner maintained no records of (1) the nights that bands appeared or failed to appear, (2) the amounts that he paid bands that performed at the Bullfrog, or (3) the amounts that he paid for band advertising expenses. Petitioner issued no Forms 1099 to the bands that played at the Bullfrog. Petitioner claimed no deduction for band or band advertising expenses for the years in issue, and petitioner disclosed no band or band advertising expenses to his return preparer, Mr. Dillon.

In the notice of deficiency, respondent allowed petitioner deductions for band advertising expenses for 1987 and 1988 in the amounts of $1,596 and $1,740, respectively, but allowed nothing

---

[12] We note that several back copies of Nite-Line are not available for the years in issue.

for 1989 and 1990. Respondent now agrees that petitioner is allowed deductions for band advertising expenses in the amounts of $1,416 for 1989 and $1,596 for 1990. Respondent allowed petitioner no deduction for amounts allegedly paid to bands that played at the Bullfrog.

2. Race Car Expenses--1987 and 1988

During 1987 and 1988, petitioner owned a "cadet car"[13] that he raced in a novice class on Saturday nights at Stateline Speedway (speedway). Petitioner also owned a truck, described below, which he used to tow the race car to and from the speedway, located in Busti, New York, approximately 4 miles from his home. The Bullfrog and Arthur R. Gren Co., Inc., a beer distributor, sponsored the race car. Patrons from the Bullfrog often came out to the speedway to see petitioner race.

On his 1987 and 1988 returns, petitioner claimed Schedule C losses from the operation of his race car. For 1987, petitioner reported income of $1,965 and claimed expenses of $2,865. For 1988, petitioner reported income of $2,440 and claimed expenses of $2,604.

Petitioner's expenses associated with the race car included: Gasoline, oil, tires, A-frames, ball-joints, spark plugs, spark plug wires, distributor caps, pit entrance fees, paint, and

---

[13] A "cadet car" is a "stock car" which is defined as a racing car having the basic chassis of a commercially produced assembly-line model. Webster's Third New International Dictionary (1993).

miscellaneous car repairs (including parts).  Petitioner raced the car approximately 10 times during each of the years in issue. In support of his claimed deductions, petitioner provided his return preparer, Mr. Dillon, with a summary listing of gasoline and parts purchased during 1987 and 1988.  At trial, petitioner produced no receipts for the race car expenses, which he generally paid in cash.  Respondent disallowed petitioner's deductions for race car expenses on the basis of petitioner's failure to substantiate them.

### 3.  Truck Expenses--1990

During 1990, petitioner owned a 1976 Ford pickup truck which he used in his business at the Bullfrog.  Petitioner used the vehicle to pick up restaurant supplies, haul garbage to the dump, drive to the bank, and drive drunk patrons home after the bar closed at night.  Petitioner claimed truck expenses for the Bullfrog in the amount of $3,800.  Respondent disallowed petitioner's deduction for truck expenses on the basis of petitioner's failure to substantiate the claimed expenses.

OPINION

## I.  Period of Limitations and Fraud

The deficiency notice in the instant case was sent on April 1, 1996, after the expiration of the usual 3-year period of

limitations provided in section 6501(a).[14]  The contention that the period of limitations has expired is an affirmative defense which must be specifically pleaded.  Rule 39; <u>Robinson v. Commissioner</u>, 57 T.C. 735, 737 (1972).  Petitioner properly raised in his petition the affirmative defense of the expiration of the period of limitations for each year in issue except 1989. Petitioner's failure to plead the affirmative defense of the expiration of the period of limitations with respect to 1989 constitutes a waiver of the defense for that year.  Rule 34(b)(4); see <u>Shopsin v. Commissioner</u>, T.C. Memo. 1984-151, affd. without published opinion 751 F.2d 371 (2d Cir. 1984). Consequently, we conclude that the assessment and collection of any deficiency for 1989 is not barred by the period of limitations.

As to the remaining years (i.e., 1987, 1988, and 1990), however, unless one of the exceptions to the period of limitations is applicable, the assessment of the deficiencies, additions, and penalties determined in the deficiency notice is

_____

[14]    Sec. 6501(a) reads as follows:

> SEC. 6501(a).  General rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * , and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

- 15 -

barred.  Respondent contends that the instant case falls within the exception in section 6501(c)(1), which provides that tax may be assessed at any time if a false or fraudulent return is filed with the intent to evade tax.[15]  Accordingly, respondent also determined in the deficiency notice that petitioner is liable for (1) additions to tax for fraud under section 6653(b)(1)(A) and (B) for 1987,[16] (2) an addition to tax for fraud under section 6653(b) for 1988,[17] and (3) a penalty for fraud under section

---

[15]   In the alternative, respondent contends that petitioner's return for 1990 is subject to the 6-year period of limitations applicable under sec. 6501(e)(1)(A) because that return omitted substantial amounts of gross income.  We need not consider respondent's alternative argument because we find fraud for each of the years in issue, including 1990.

[16]   Sec. 6653(b)(1)(A) and (B) reads as follows:

SEC. 6653(b).  Fraud.--

    (1)  In general.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to the sum of--

        (A)  75 percent of the portion of the underpayment which is attributable to fraud, and

        (B)  an amount equal to 50 percent of the interest payable under section 6601 with respect to such portion for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax or, if earlier, the date of the payment of the tax.

[17]   Sec. 6653(b) reads, in pertinent part, as follows:

SEC. 6653(b).  Fraud.--

(continued...)

6663 for 1989 and 1990.[18]

The Commissioner has the burden of proving the applicability of the fraud exception to the general period of limitations. Sec. 7454; Rule 142(b); Farmers Feed Co. v. Commissioner, 10 B.T.A. 1069, 1075-1076 (1928). The Commissioner's burden is the same as that which is borne with respect to the fraud additions imposed under section 6653(b) and the fraud penalties imposed under section 6663. See, e.g., Schaffer v. Commissioner, 779 F.2d 849, 857 (2d Cir. 1985), affg. in part and remanding in part T.C. Memo. 1982-34; Asphalt Indus., Inc. v. Commissioner, 384 F.2d 229, 232 (3d Cir. 1967), revg. on other grounds 46 T.C. 622 (1966); Estate of Temple v. Commissioner, 67 T.C. 143, 159-160 (1976). Accordingly, we consider together (1) the fraud exception to the general 3-year period of limitations with respect to 1987, 1988, and 1990 and (2) the fraud additions and penalties for all years in issue, including 1989.

---

[17](...continued)
        (1)  In general.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

[18]    Sec. 6663 reads, in pertinent part, as follows:

        SEC. 6663(a). Imposition of Penalty.--If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

To carry the burden of proof on the fraud exception and the fraud additions and penalties, the Commissioner must show by clear and convincing evidence both (1) that the taxpayer underpaid his tax for each taxable year in issue and (2) that at least some part of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b); DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983).

A.    Proof of an Underpayment

The Commissioner need not prove the precise amount of the underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. To carry that burden, the Commissioner may not rely on the taxpayer's failure to meet his burden of proving error in the Commissioner's determinations as to the deficiencies. DiLeo v. Commissioner, supra at 873; Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982); Otsuki v. Commissioner, 53 T.C. 96, 106 (1969).

In the instant case, it is uncontroverted that petitioner failed to report certain gross receipts during the years in issue. Petitioner concedes unreported gross receipts on brief and in his stipulated calculations. Accordingly, we conclude that the record contains clear and convincing evidence of

unreported gross receipts for each year in issue.

The existence of unreported gross receipts, however, does not demonstrate that petitioner underpaid his tax for each of the years in issue. Indeed, gross receipts from sales must be reduced by cost of goods sold to determine gross income from sales. Sec. 1.61-3(a), Income Tax Regs. Moreover, gross income from sales must be reduced by all deductible expenses to determine taxable income from sales. Sec. 63(a). Accordingly, an underpayment of tax resulting from unreported gross receipts from sales is possible only if such unreported gross receipts are not exceeded by cost of goods sold and deductible expenses. See, e.g., Franklin v. Commissioner, T.C. Memo. 1993-184.

In the instant case, petitioner contends that he did not underpay his tax for the years in issue because the profits from unreported sales of alcoholic beverages at the Bullfrog were used to pay bands that performed at the Bullfrog.

The general rule is well settled that, even in criminal cases where the Government bears the greater burden of proof, i.e. beyond a reasonable doubt, "'evidence of unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses, if any.'" United States v. Garguilo, 554 F.2d 59, 62 (2d Cir. 1977) (quoting Siravo v. United States, 377 F.2d 469, 473 (1st Cir. 1967)); United States v. Campbell, 351 F.2d 336, 339 (2d Cir. 1965); Gleave v. Commissioner, T.C. Memo. 1997-276; Franklin v. Commissioner, supra.

Citing Richardson v. Commissioner, 264 F.2d 400, 404 (4th Cir. 1959), revg. in part T.C. Memo. 1957-122, and Perez v. Commissioner, T.C. Memo. 1974-211, however, petitioner contends that respondent bears the burden of proving that petitioner did not incur the band expenses that he now claims. Petitioner argues that respondent failed to carry this burden because respondent presented no evidence whatsoever with respect to the band expenses.

We have no doubt, as indicated by our findings of fact, that petitioner incurred deductible band expenses during the years in issue. We conclude, however, that even if we credit petitioner with the band expenses that he claims, much of which we credit infra in deciding the correct amount of the deficiency, those expenses, along with the additional expenses and purchases conceded by respondent, nonetheless would be insufficient to offset the unreported gross receipts proved by respondent and discussed more fully infra.[19] We therefore find it unnecessary

---

[19]    The following computation demonstrates that petitioner would have unreported income even if, in addition to the expenses and purchases conceded by respondent, we credited petitioner with the full amount of the band expenses he claims:

|  | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|
| Unreported gross receipts[1] | $104,917 | $116,072 | $127,474 | $31,369 |
| Less: |  |  |  |  |
| Band expenses[2] | 36,300 | 39,600 | 32,175 | 13,200 |
| Band advertising expenses | 1,596 | 1,740 | 1,416 | 1,596 |
| 7-percent New York State sales tax[3] | 7,344 | 8,125 | 8,923 | 2,195 |
| Additional purchases[4] | 39,228 | 42,787 | 48,061 | 13,620 |
| Total unreported income | 20,449 | 23,820 | 36,899 | 758 |

(continued...)

to explore the implications of <u>Richardson v. Commissioner</u>, <u>supra</u> and <u>Perez v. Commissioner</u>, <u>supra</u>. Consequently, we conclude, that respondent has shown by clear and convincing evidence that petitioner had unreported gross receipts, net of expenses, which result in an underpayment of tax for each year in issue.

B. <u>Proof That the Underpayment Was Due to Fraud</u>

Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. <u>Powell v. Granquist</u>, 252 F.2d 56 (9th Cir. 1958); <u>DiLeo v. Commissioner</u>, 96 T.C. at 874; <u>Miller v. Commissioner</u>, 94 T.C. 316, 332 (1990). The Commissioner's burden of proving fraud is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of taxes. <u>Stoltzfus v. United States</u>, 398 F.2d 1002, 1004 (3d Cir. 1968); <u>DiLeo v. Commissioner</u>, <u>supra</u> at 874; <u>Rowlee v. Commissioner</u>, 80 T.C. 1111, 1123 (1983).

The existence of fraud is a question of fact and is to be

---

[19](...continued)

[1]These figures (rounded to the nearest dollar) represent petitioner's unreported gross receipts as recalculated in accordance with this opinion. See the discussion concerning gross receipts in part II of this opinion, <u>infra</u>.

[2]These figures represent the amount of band expenses claimed by petitioner in the stipulated computations. As discussed <u>infra</u>, we conclude that petitioner is entitled to deduct band expenses in the amount of $18,150 for 1987, $19,800 for 1988, $16,088 for 1989, and $13,200 for 1990.

[3]Respondent concedes that petitioner may deduct the 7-percent New York State sales tax associated with any additional gross receipts received by petitioner from the sale of beer, wine, or liquor. We computed the sales tax shown above on the basis of the amount of petitioner's unreported gross receipts as recalculated in accordance with this opinion.

[4]These figures represent the additional purchases allowed by respondent in the deficiency notice and in the stipulation of facts.

resolved on the basis of the entire record.  DiLeo v. Commissioner, supra at 874; Gajewski v. Commissioner, 67 T.C. 181, 191 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud is not to be imputed or presumed.  It must be affirmatively established by clear and convincing evidence.  Beaver v. Commissioner, 55 T.C. 85, 92 (1970).  The taxpayer's entire course of conduct may establish the requisite fraudulent intent.  DiLeo v. Commissioner, supra at 874; Stone v. Commissioner, 56 T.C. 213, 223-224 (1971).  Because direct evidence of the taxpayer's fraudulent intent is rarely available, fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts.  DiLeo v. Commissioner, supra at 874; Rowlee v. Commissioner, supra at 1123.

Courts have relied on a number of indicia of fraud in deciding whether to sustain the Commissioner's determinations with respect to fraud.  Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence of fraud.  Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).  In Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601, the Court of Appeals for the Ninth Circuit gave a nonexclusive list of circumstantial evidence that may give rise to a finding of fraudulent intent.  Badges of fraud include (1) understatement of income, (2) inadequate records, and (3) dealing in cash.  Id.  A failure to be forthright with one's return

preparer is also an indication of fraud, Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. per curiam T.C. Memo. 1985-63, as is a conviction under section 7206(1), Wright v. Commissioner, 84 T.C. 636 (1985).

Although the mere failure to report income is not sufficient to establish fraud, Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172, a pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud, see Holland v. United States, 348 U.S. 121, 139 (1954); Parks v. Commissioner, 94 T.C. 654, 664 (1990); Otsuki v. Commissioner, 53 T.C. at 108. In the instant case, considering the record as a whole, we conclude that there are sufficient badges of fraud to carry respondent's burden of proof. The record reveals a pattern of consistent underreporting of income by petitioner during all of the years in issue. Moreover, it is uncontroverted that petitioner failed to maintain adequate records of his unreported income and expenses and that petitioner conducted much of his business in cash. Additionally, petitioner failed to be forthcoming with his return preparer, Mr. Dillon, disclosing neither his cash purchases nor his band expenses, including band advertising. Furthermore, while a conviction under section 7206(1) does not establish fraud, it is one factor to be considered. Wright v. Commissioner, supra at 643-644.

We conclude that the record in the instant case contains clear and convincing evidence that there was an underpayment for

each year in issue and that each such underpayment was due to fraud.

C.    Conclusion

Having found fraud for each year in issue, we conclude that: (1) Section 6501(a) does not operate to bar the assessment and collection of taxes for 1987, 1988, and 1990; (2) for 1987, petitioner is liable for the 75-percent fraud addition to tax under section 6653(b)(1)(A) and for the additional amount added to the tax under section 6653(b)(1)(B); (3) for 1988, petitioner is liable for the 75-percent fraud addition to tax under section 6653(b); and (4) for 1989 and 1990, petitioner is liable for the 75-percent fraud penalty under section 6663.

We have considered the parties' remaining arguments as to fraud and conclude that the arguments are either without merit or unnecessary to reach in light of our holdings above.

II.  Amount of the Deficiency[20]

A.    Unreported Gross Receipts

Although petitioner conceded unreported gross receipts, petitioner did not concede unreported gross receipts in the amounts determined by respondent.  Petitioner contends that respondent's reconstruction of gross receipts is overstated

---

[20]    On brief, both parties make extensive arguments concerning who bears the burden of proof with respect to the amount of the deficiency.  We need not decide the situs of the burden of proof, however, because the record in the instant case is sufficient for us to reach our findings of fact without resort to the burden of proof.

because it relies on certain erroneous assumptions.  Each contested item is addressed separately below.

1.  Keg Sales

Petitioner asserts that respondent's calculation of gross receipts from the sale of draft beer is overstated because it makes no allowance for kegs that were sold for off-premises consumption.[21]  Petitioner contends that, during each year in issue, he sold approximately 85 kegs to go at a price of $5 over cost.

In support of his position, petitioner points to his testimony and that of Ms. Stacey.  Petitioner testified that he sold kegs throughout the calendar year, but that the busiest period for keg sales was from May to October, with sales peaking during the summer months (June, July, and August).  Petitioner indicated that he sold approximately 3 to 3½ kegs per week during the peak summer months (June, July, and August), and 2 to 3 kegs per week during the remainder of the busy season (May, September, and October).  Petitioner also testified that he had seven or

---

[21]    The parties also disagree as to the proper discretionary use allowance to be applied to the sale of keg beer.  Petitioner's stipulated computations assert that a discretionary use allowance of 15 percent should be applied to all over-the-bar keg beer sales.  Respondent's stipulated computations, however, apply a greater discretionary use allowance of 17 percent for all over-the-bar sales of keg beer.  We conclude that respondent's stipulated calculations concede that 17 percent is the proper discretionary use allowance for over-the-bar sales of keg beer.
    Neither party asserts that a discretionary use allowance would be proper for to-go sales of kegs.  Accordingly, we do not apply a discretionary use allowance in deciding petitioner's gross receipts from to-go sales of kegs.

eight portable keg taps on hand at the Bullfrog.

Ms. Stacey's testimony indicates that, although she had no involvement in the sale of kegs at the Bullfrog, she saw individuals purchase kegs for parties, weddings, and special occasions. Ms. Stacey recalled that petitioner sold two to three kegs per week, depending on the season, and that more kegs were sold during the summer months. Ms. Stacey, however, could not say with certainty the total number of kegs sold to go. Furthermore, she did not know whether petitioner owned any portable keg taps.

Respondent urges this Court to discount petitioner's testimony as unreliable and self-serving because petitioner maintained no books or records from which the number of kegs he sold to go can be determined. Emphasizing the fact that Ms. Stacey had no direct involvement in the sale of kegs and could neither say how many kegs petitioner allegedly sold to go nor corroborate the claim that petitioner had portable keg taps on hand for use with kegs sold to go, respondent also calls into doubt the testimony of Ms. Stacey. Respondent contends that petitioner's attempt to rebut the determination of gross receipts from the sale of keg beer falls solely on petitioner's self-serving, uncorroborated testimony, which is insufficient to refute respondent's determination.

Generally, a taxpayer's unimpeached, competent, and relevant testimony may not be arbitrarily discredited and disregarded.

See, e.g., <u>Blackmer v. Commissioner</u>, 70 F.2d 255, 257 (2d Cir. 1934); <u>Akerson v. Commissioner</u>, T.C. Memo. 1998-129 (and the cases cited therein).  Petitioner's testimony was believable and was corroborated by the testimony of Ms. Stacey, whom we also find credible.  Although she could not say with certainty the number of kegs sold, or whether petitioner had portable keg taps on hand, Ms. Stacey did see kegs of beer sold to go at the Bullfrog.

We are satisfied from the record that petitioner did in fact sell kegs of beer to go at a price of $5 over cost.  The only question remaining is the quantity sold.  Bearing heavily against petitioner, whose inexactitude is of his own making, we find, on the basis of the record before us, that petitioner sold 40 kegs to go during each year in issue.  Cf. <u>Cohan v. Commissioner</u>, 39 F.2d 540 (2d Cir. 1930).  Accordingly, we conclude that petitioner's gross receipts from the sale of keg beer are as follows:

| Year | Over-the-Bar Gross Receipts | To-Go Gross Receipts | Total Gross Receipts[1] |
|------|-----------------------------|----------------------|-------------------------|
| 1987 | $9,120.87 | $1,125.20 | $10,246.07 |
| 1988 | 15,365.79 | 1,132.00 | 16,497.79 |
| 1989 | 17,214.62 | 1,224.40 | 18,439.02 |
| 1990 | 15,735.56 | 1,248.00 | 16,983.56 |

[1]See Table I in the attached appendix.

### 2.   Canned Beer Sales

Petitioner asserts that respondent erred by calculating gross receipts from the sale of canned beer on the assumption

that all cans were sold over the bar, for on-emisesconsumption.[22]

Petitioner contends that during the time preceding April 1990, he sold canned beer exclusively to go in six-packs for $3.25 each ($4 each for premium brands such as Michelob and Molson).[23] Petitioner, however, acknowledges that over-the-bar as well as to-go canned beer sales occurred during the period after April 1990.[24]

Respondent argues that the only evidence presented in support of petitioner's position is petitioner's uncorroborated, self-serving testimony. Respondent first points out that Ms.

---

[22] The parties also disagree as to the proper discretionary use allowance to be applied in the determination of gross receipts from the sale of canned beer. Each party stipulated the other's computations on the basis of the respective party's own discretionary use contention. Respondent contends that the proper discretionary use allowance for over-the-bar sales of canned beer is 8.3 percent. Petitioner contends that a 15-percent discretionary use allowance for over-the-bar canned beer sales is proper and correct. Petitioner, however, abandoned that position on brief, as he presented no argument concerning the proper discretionary use allowance for canned beer sales and the record contains no evidence of the proper allowance. Accordingly, we conclude that petitioner has conceded that the proper discretionary use allowance for over-the-bar canned beer sales is 8.3 percent. Rybak v. Commissioner, 91 T.C. 524, 566 (1988).
   Neither party asserts that a discretionary use allowance would be proper for to-go sales of canned beer. Accordingly, we do not apply a discretionary use allowance in deciding petitioner's gross receipts from to-go sales of canned beer.

[23] Petitioner indicated that premium brands generally did not sell well.

[24] Petitioner testified that he switched to cans from bottles during 1990 because the cans were cheaper, easier to handle, and took up less space in the storeroom. Additionally, petitioner viewed the cans as a safer alternative to bottles, which had been known to cause injury when thrown by rowdy patrons.

Stacey's testimony regarding the price charged for six-packs does not support that of petitioner. We disagree. Ms. Stacey testified that canned beer was sold to go at the Bullfrog at a price of $3 to $3.50 depending on the brand of beer sold. Petitioner's statement that six-packs sold for $3.25 is not inconsistent with the range indicated by Ms. Stacey.

Next, respondent argues that a stipulated sampling of 34 cash register tapes from 1987 and 1988 fails to corroborate petitioner's contention that six-packs were sold only to go during the period prior to April 1990. Respondent argues that the sampling should show 238 entries of $3.25 under category I (for beer sales) if petitioner in fact sold all canned beer to go during the 2-year period including 1987 and 1988.[25] Respondent contends that the stipulated sampling contains only four such entries. Such a large disparity, respondent argues, casts doubt on petitioner's claim that he sold canned beer to go.

We do not find the lack of entries on the stipulated sampling of cash register tapes fatal to petitioner's contention

---

[25] Respondent notes that petitioner purchased 5,600 six-packs of beer during 1987 and 1988 (i.e., 732 cases in 1987 + 668 cases in 1988 = 1,400 cases x 4 six-packs per case = 5,600 six-packs). On the basis of the fact that the Bullfrog is open 7 days a week, 365 days a year, respondent contends that petitioner would have sold over seven six-packs a day, if petitioner in fact sold all canned beer to go during the 2-year period (i.e., 5,600 six-packs ÷ 730 days = 7.7 six-packs per day). Accordingly, respondent contends that the 34-day stipulated sample should contain 238 entries of $3.25 under category I (i.e., 34 days x 7 six-packs per day = 238 entries).

that he sold six-packs of beer to go during the years in issue. Rather, we would not expect the cash register receipts to include all of petitioner's six-pack sales. Although Ms. Stacey testified that she rang up all six-pack sales, she also testified that she sold relatively few six-packs of beer during her shift (i.e., 11 a.m. to 2 p.m.) at the Bullfrog. Except occasionally, Ms. Stacey did not work weekends and evenings when the bulk of petitioner's six-pack sales took place. Furthermore, petitioner testified that he failed to ring up all six-pack sales.[26]

We conclude from the record that petitioner sold six-packs of beer to go for $3.25 each during the years in issue. We are not persuaded, however, that petitioner sold canned beer exclusively to go during the period preceding April 1990. Petitioner testified that he sold 5 to 10 six-packs each night during the weekend (i.e., Friday and Saturday) and 2 to 3 six-packs each night during the remainder of the week (i.e., Sunday through Thursday). Petitioner purchased 2,928 six-packs during 1987, 2,672 six-packs during 1988, and 2,464 six-packs during 1989.[27] Had all of those six-packs been sold to go, petitioner

---

[26] Moreover, we note that there is no analysis accompanying the stipulated sampling of cash register tapes, and respondent introduced no evidence as to how the sample was selected. We therefore accord such evidence little weight in our analysis and decision.

[27] Total six-packs purchased each year was determined as
(continued...)

would have sold 56 six-packs each week during 1987, 51 six-packs each week during 1988, and 47 six-packs each week during 1989. Petitioner's testimony, however, indicates that he sold a maximum of 35 six-packs each week (i.e., 10 six-packs each day Friday through Saturday, and 3 six-packs each day Sunday through Thursday). On the record before us, we find that petitioner sold to go 1,352 six-packs each year (8 six-packs each weekend day, and 2 six-packs each weekday). Cf. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Accordingly, we conclude that petitioner's gross receipts from the sale of canned beer are as follows:

| Year | Over-the-Bar Gross Receipts | To-Go Gross Receipts | Total Gross Receipts[1] |
|------|------------------------------|----------------------|--------------------------|
| 1987 | $9,534.80 | $4,394 | $13,928.80 |
| 1988 | 7,986.00 | 4,394 | 12,380.00 |
| 1989 | 6,727.60 | 4,394 | 11,121.60 |
| 1990 | 21,271.80 | 4,394 | 25,665.80 |

[1]See Table II in the attached appendix.

### 3. Bottled Beer Sales

Petitioner contends that the 8.3-percent discretionary use

---

[27](...continued) follows:

| | 1987 | 1988 | 1989 |
|---|------|------|------|
| Cases of beer purchased | 732 | 668 | 616 |
| Multiplied by 24 cans/case | 24 | 24 | 24 |
| Total cans purchased | 17,568 | 16,032 | 14,784 |
| Divided by 6 cans/pack | 6 | 6 | 6 |
| Total six-packs | 2,928 | 2,672 | 2,464 |

allowance applied by respondent in the calculation of gross receipts from the sale of bottled beer is unreasonably low, especially considering that respondent used a 17-percent discretionary use allowance for sales of draft beer which, unlike bottled beer, does not involve breakage. Petitioner asserts that he should be afforded a 15-percent allowance for discretionary use in computing gross receipts from the sale of bottled beer.

In support of his contention, petitioner offers (1) his testimony that he gave away free beers to patrons and band members and (2) Ms. Stacey's testimony that she also gave away free drinks at the Bullfrog.[28] This testimony, however, does not persuade us that 15 percent is the proper discretionary use allowance. Although petitioner testified that he gave one complimentary beer for every four or five beers purchased, he also indicated that he favored certain patrons with free drinks. Accordingly, petitioner's testimony indicates that he did not employ a consistent policy of providing complimentary drinks at the Bullfrog. Given in response to questioning concerning liquor sales, Ms. Stacey's testimony regarding free drinks of liquor likewise sheds no light on the appropriate discretionary use allowance for bottled beer sales. We conclude that 8.3 percent

---

[28] Ms. Stacey indicated that she generally gave patrons free drinks upon the purchase of three or four rounds. She also testified that she usually dispensed the last shot in each bottle of liquor free of charge.

is a reasonable allowance for discretionary use.  See, e.g.,

Jurkiewicz v. Commissioner, T.C. Memo. 1955-318 (5-percent

reduction for spillage, waste, and gratuities sustained).

Consequently, we find that petitioner's gross receipts from the

sale of bottled beer are as follows:

| Year | Bottled Beer Gross Receipts[1] |
|------|-------------------------------|
| 1987 | $135,011.80 |
| 1988 | 116,740.80 |
| 1989 | 118,071.80 |
| 1990 | 62,920.00 |

[1]See Table III in the attached appendix.

### 4.  Wine Sales

Petitioner contends that respondent erred by calculating

gross receipts from the sale of wine on the assumption that each

glass of wine sold contained only 4 ounces of wine.  To the

contrary, petitioner asserts that each glass of wine sold

contained 6 ounces of wine.[29]

Respondent seeks to use an apparent inconsistency in

petitioner's testimony to impugn petitioner's claim regarding the

---

[29]    Petitioner and respondent also disagree on the proper
discretionary use percentage to be applied in the calculation of
gross receipts from the sale of wine.  Petitioner asserts that 15
percent is the proper discretionary use allowance for all wine
sales.  On brief, and in respondent's stipulated calculations,
however, respondent contends that the proper discretionary use
allowance for wine sales is 20 percent for each .750-liter
bottle, 1.5-liter bottle, and 3-liter bottle and 40 percent for
each liter bottle.  We conclude that respondent has conceded that
the proper discretionary use allowance for wine sales is 20
percent or 40 percent, for the respective size bottle.

amount of wine poured in each glass.  Initially, petitioner testified that each .750-liter bottle yielded approximately four 6-ounce servings of wine if it was served over ice in a 10-ounce glass.[30]  Later, however, petitioner indicated that each bottle served only 2½ glasses of wine.  When viewed in context, however, petitioner's testimony reveals no incongruity.  Petitioner's statement that each bottle yielded only 2½ glasses of wine was made in response to respondent's inquiry as to whether wine was served over ice.  Petitioner stated that wine was served "either way" and then elaborated on how many servings he obtained from each bottle.[31]  Petitioner's testimony that he got "only * * * 2½ glasses of wine" from each bottle appears to clarify the number of servings of wine each bottle yielded when the wine was served without ice in a 10-ounce glass.  Accordingly, we find no irreconcilable conflict in petitioner's testimony.

Respondent contends that a 6-ounce serving of wine is

---

[30]    25.13 ounces per bottle ÷ 4 glasses per bottle = 6.28 ounces per glass.

[31]    The transcript reads, in pertinent part, as follows:

Q.    Now, you testified that its over ice, correct?
A.    Well, either way.  They could drink a glass of wine up, you know --
Q.    Right.
A.    -- on the rocks, and you'd probably only get three glasses or two-and-a-half out of a bottle.  If you use a 10-ounce glass -- if you had a 25 ounce glass and you had a 10 -- a 10-ounce glass, you'd only get 2 [and one-half] glasses of wine.

"unreasonably large" and that aside from petitioner's testimony, the record is devoid of any further evidence to support or corroborate his assertions.  To the contrary, we find that the record is devoid of any evidence as to what constitutes an "unreasonably large" glass of wine.  Moreover, we find no reason to doubt either the honesty or credibility of petitioner's testimony concerning the size of wine drinks served at the Bullfrog.  Accordingly, we find that each wine drink sold contained 6 ounces of wine.  Consequently we conclude that petitioner's gross receipts from the sale of wine are as follows:

| Year | Wine Gross Receipts[1] |
|------|------------------------|
| 1987 | $1,053.92 |
| 1988 | 1,499.80 |
| 1989 | 1,521.91 |
| 1990 | 1,503.49 |

[1]See Table IV in the attached appendix.

### 5.  Liquor Sales

Petitioner asserts that each liquor drink sold contained 1.6 ounces of liquor and that respondent erred by calculating gross receipts from the sale of liquor on the assumption that each liquor drink sold contained only 1 ounce of liquor.

Respondent predicated the determination that each liquor drink contained only 1 ounce of liquor on petitioner's earlier statement to Revenue Agent Theresa Antoun (Ms. Antoun) during a February 1990 interview.  In that interview petitioner indicated

that he sold shots of liquor for $1 and that each bottle of liquor contained approximately 20 to 22 shots. Respondent determined that each liquor drink contained 1 ounce of liquor on the basis of the sale of 21 shots from each .750-liter bottle of liquor (i.e., after the 16-percent discretionary use allowance each .750-liter bottle yields twenty-one 1-ounce shots).[32]

Petitioner testified that he sold liquor drinks ranging in size from 1.5 to 1.75 ounces per drink. Although drinks were "free poured" (i.e., measured by eye rather than a standard measuring device), petitioner indicated that it was his "standard policy" to "give them a good drink at the Bullfrog" and that "everybody got a good shot and a half [to a] shot and three quarters." Accordingly, petitioner contends that the average amount of liquor poured in each drink was 1.6 ounces. Petitioner also contends that his testimony is fully consistent with his earlier statement to Ms. Antoun because each liter bottle of liquor generates 20 to 22 shots which are at least 1.5 ounces.[33]

---

[32]    We confirmed respondent's computation as follows:

| | |
|---|---|
| Ounces per .750-liter bottle | 25.13 |
| Less: 16-percent discretionary use allowance | 4.02 |
| Ounces available for sale | 21.11 |
| Divided by 21 shots per bottle | 21 |
| Ounces per shot | 1.005 (rounded to 1) |

[33]    If 20 shots are sold from each liter bottle, petitioner contends that each shot is at least 1.65 ounces (i.e., 33 ounces ÷ 20 shots = 1.65 ounces per shot). If 22 shots are sold from
(continued...)

We think that both parties have missed the mark. Respondent's determination that each liquor drink contained only 1 ounce of liquor ignores the fact that the majority of petitioner's liquor purchases were liter bottles, not .750-liter bottles.[34]   Petitioner's contention that each liquor drink contains 1.6 ounces of liquor ignores the discretionary use allowance which operates to reduce the amount of liquor available for sale.  After a 16-percent discretionary use allowance, each liter bottle would yield twenty-one 1.3-ounce liquor drinks.[35]

---

[33](...continued)
each liter bottle, petitioner contends that each shot is at least 1.5 ounces (i.e., 33 ounces ÷ 22 shots = 1.5 ounces per shot). The parties stipulated that each liter bottle contains 33.5 ounces of liquor; we are unsure why petitioner used 33 ounces per bottle in his argument on brief.

[34]    Petitioner purchased .750-liter bottles and liter bottles of liquor as follows:

|  | Quantity Purchased | | | |
| Item Purchased | 1987 | 1988 | 1989 | 1990 |
| Liquor: | | | | |
| Liter bottles | 1,114 | 1,658 | 2,087 | 1,140 |
| .750-liter bottles | 60 | 79 | 12 | 9 |
| Total bottles purchased | 1,174 | 1,737 | 2,099 | 1,149 |

[35]    We determined that each liquor drink contained 1.3 ounces of liquor as follows:

| | |
| Ounces in each liter bottle | 33.50 |
| Less: 16-percent discretionary use allowance | 5.36 |
| Ounces available for sale | 28.14 |
| Divided by 21 shots per bottle | 21 |
| Ounces per shot | 1.34 (rounded to 1.3) |

(continued...)

Accordingly, we find that each liquor drink sold contained 1.3 ounces of liquor.  Consequently we conclude that petitioner's gross receipts from the sale of liquor are as follows:

| Year | Liquor Gross Receipts[1] |
|------|--------------------------|
| 1987 | $28,856.38 |
| 1988 | 42,755.46 |
| 1989 | 52,185.19 |
| 1990 | 28,551.23 |

[1]See Table V in the attached appendix.

### 6.  Conclusion

On the basis of our findings above, we conclude that petitioner had unreported gross receipts of $104,917.40 for 1987, $116,072.49 for 1988, $127,473.82 for 1989, and $31,369.34 for 1990.[36]

### B.  Expenses

#### 1.  Band Expenses

Petitioner argues that he is entitled to deductions for band expenses he incurred during the years in issue.  Respondent allowed petitioner a deduction for band advertising expenses but allowed no deduction for the related band expenses on the ground that petitioner failed to substantiate those expenses.

The Court must estimate the amount of the deductible expense

---

[35](...continued)
Respondent conceded on brief that 16 percent is the proper discretionary use allowance for liquor sales.

[36]    See Table VI in the attached appendix.

if a taxpayer establishes that a deductible expense was paid, even though the precise amount has not been established.  Cohan v. Commissioner, 39 F.2d at 543-544.  We are satisfied by the testimony of petitioner, Ms. Stacey, and Mr. Blackburn that petitioner incurred deductible band expenses during the years in issue.  Petitioner and Ms. Stacey both testified that petitioner hired bands to play at the Bullfrog throughout the years in issue.  Mr. Blackburn, the local entertainment agent, testified that he personally placed bands at the Bullfrog during the years in issue.  That petitioner incurred deductible band expenses is further corroborated by the stipulated fact that petitioner advertised bands and incurred band advertising expenses.  From such advertising expenses we draw the reasonable inference that petitioner did, in fact, pay some amount of deductible band expenses.

Relying on Professional Servs. v. Commissioner, 79 T.C. 888 (1982), respondent contends that the Cohan rule is inapplicable for all of the years in issue because the evidence is insufficient to make a reasonable estimation of petitioner's band expenses.[37]

---

[37]    Citing Lerch v. Commissioner, 877 F.2d 624 (7th Cir. 1989), affg. T.C. Memo. 1987-295, respondent also argues that Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), should not be invoked where the claimed but unsubstantiated deductions are of a sort for which the taxpayer could have and should have maintained the necessary records.  Absent stipulation to the contrary, the instant case is appealable to the Court of Appeals for the Second

(continued...)

In the instant case, we make our estimate on the basis of Nite-Line's records, stipulated for trial, which indicate that petitioner advertised in Nite-Line 44 weeks during 1987, 48 weeks during 1988, 39 weeks during 1989, and 44 weeks during 1990. Available back copies of Nite-Line demonstrate that, during the years in issue, petitioner regularly listed three band nights (typically Thursday, Friday, and Saturday) in each advertisement. We also credit petitioner's testimony concerning the amounts he paid bands booked to play at the Bullfrog, which indicates that he generally paid Thursday night bands $225 for each performance. Petitioner's testimony also indicates that he typically paid Friday and Saturday night bands $300, although he occasionally paid up to $500 for popular bands. Petitioner's testimony is corroborated by that of Mr. Blackburn, who indicated that in Jamestown, during the years in issue, the going rate for a Thursday night band was at least $250 and that the going rate for a weekend band (i.e., Friday or Saturday night) was $250 to $350.

Using the foregoing parameters, petitioner computed band expenses in the amounts of $36,300, $39,600, $32,175, and $26,400 for 1987, 1988, 1989, and 1990, respectively.[38] The Nite-Line

---

[37](...continued)
Circuit. Thus, efficient and harmonious judicial administration calls for us to apply the Cohan rule. Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

[38]     Petitioner computed the amount of his deductible band

(continued...)

records upon which petitioner's computations are based, however, do not reveal whether bands actually performed at the Bullfrog, or how much the bands were actually paid. Additionally, several copies of Nite-Line were unavailable. We cannot say with certainty what information those unavailable back copies would reveal. Moreover, petitioner's computations do not reflect any allowance for bands that failed to perform as advertised. Bearing heavily against petitioner, whose inexactitude is of his own making, Cohan v. Commissioner, supra, we find that petitioner incurred deductible band expenses in the amounts of $18,150, $19,800, $16,088, and $13,200 for 1987, 1988, 1989, and 1990, respectively.

---

[38](...continued)
expenses as follows:

|  | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|
| Advertisements in Night-Line Magazine | 44 | 48 | 39 | 44 |
| Nights/bands in each advertisement | x 3 | x 3 | x 3 | x 2 |
| Total band/nights advertised | 132 | 144 | 117 | 88 |
| Week night bands | 44 | 48 | 39 | |
| Average week night price per band | x $225 | x $225 | x $225 | --[1] |
| Thursday night band expense | $9,900 | $10,800 | $8,775 | |
| Friday night bands advertised | 44 | 48 | 39 | 44 |
| Average price per Friday night band | x $300 | x $300 | x $300 | x $300 |
| Friday night band expense | $13,200 | $14,400 | $11,700 | $13,200 |
| Saturday night bands advertised | 44 | 48 | 39 | 44 |
| Average price per Saturday night bank | x $300 | x $300 | x $300 | x $300 |
| Saturday night band expense | $13,200 | $14,400 | $11,700 | $13,200 |
| Total band expenses | $36,300 | $39,600 | $32,175 | $26,400 |

[1]Petitioner's computation for 1990 reflects the fact that he cut back on week night bands during 1990.

### 2. Race Car Expenses--1987 and 1988

As indicated in our findings of fact, we are satisfied from the record that petitioner incurred deductible expenses in connection with his car racing business. Accordingly, an estimate must be made under Cohan v. Commissioner, supra.[39]

Petitioner testified that each year he raced the car approximately 10 times at the speedway in Busti, New York. Petitioner indicated that his race car expenses included: Gasoline, oil, tires, A-frames, ball-joints, spark plugs, spark plug wires, distributor caps, pit entrance fees, paint, and miscellaneous car repairs (including parts). Petitioner testified with particularity, however, only with respect to the pit entrance fees and tire expenditures. Petitioner indicated that each week during the racing season he paid a total of $20 in pit entrance fees for himself and a helper; and that every other week he replaced the rear tires at a cost of $50 to $55 per tire. From the record we find that petitioner incurred deductible expenses of $750 for each year in issue (i.e., 1987 and 1988). Cohan v. Commissioner, supra.

### 3. Truck Expenses--1990

Petitioner claimed truck expenses for the Bullfrog in the

---

[39] As respondent failed to argue the applicability of sec. 274(d)(4) with respect to the race car expenses claimed by petitioner, we conclude that respondent has conceded that petitioner's race car is not listed property subject to the substantiation requirements of sec. 274(d).

amount of $3,800 for 1990.  Mr. Dillon computed petitioner's deduction for truck expenses based on petitioner's statement that he put approximately 15,000 business miles on the vehicle during 1990.  Respondent disallowed petitioner's deduction for the truck expenses on the basis of petitioner's inability to substantiate them.  Respondent failed, however, to assert the applicability of section 274(d)(4), which imposes strict substantiation requirements with respect to certain listed property, defined in section 280F(d)(4)(A) to include passenger automobiles.  Section 280F(d)(5)(A) defines the term "passenger automobile" to mean any four-wheeled vehicle (i) which is manufactured primarily for use on public streets, roads, and highways, and (ii) which is rated at 6,000 pounds unloaded gross vehicle weight or less.  In the case of a truck, section 280F(d)(5)(A)(ii) is to be applied by substituting "gross vehicle weight" for "unloaded gross vehicle weight".  Sec. 280F(d)(5).

We treat respondent's failure to argue that section 274(d)(4) is applicable in the instant case as a concession that it does not apply to petitioner's vehicle.  Accordingly, we decline to apply the strict substantiation requirements imposed by section 274(d)(4) and look instead to the rule of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), to decide the amount of petitioner's truck expenses.  Bearing heavily against petitioner, whose inexactitude is of his own making, we find that petitioner

incurred deductible truck expenses of $1,500 for 1990.

We have considered the parties' remaining arguments concerning the amounts of the deficiencies for the years in issue and find those arguments to be either without merit or unnecessary to reach.

III.  Substantial Understatement

Section 6661(a) imposes an addition to tax of 25 percent of any underpayment attributable to a substantial understatement of tax.  A substantial understatement is any understatement which exceeds the greater of (1) 10 percent of the tax required to be shown on the return or (2) $5,000.  Sec. 6661(b)(1)(A).  If the taxpayer has substantial authority for the tax treatment of the item in question, or if the taxpayer adequately discloses the tax treatment of the item on the return, then the amount of the understatement for purposes of this section will be reduced by that portion of the understatement which is attributable to that item.  Sec. 6661(b)(2)(B).

Petitioner made no disclosures with his returns for the years in issue.  Petitioner argues simply that there is no underpayment of tax for any of the years in issue which constitutes a substantial understatement of income tax within the meaning of section 6661.  Consequently, should either the 1987 or the 1988 understatement of tax as recalculated in accordance with

this opinion be substantial, we hold that petitioner is liable for the addition to tax under section 6661 for the applicable year.

<u>Decision will be entered</u>

<u>under Rule 155</u>.

## Appendix

### Table I  Gross Receipts From Keg Beer Sales

|  | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|
| Kegs purchased | 151 | 227 | 249.50 | 231.50 |
| Less:  Kegs sold to go | 40 | 40 | 40 | 40 |
| Kegs sold over the bar | 111 | 187 | 209.50 | 191.50 |
| Multiplied by $82.17[1] | $82.17 | $82.17 | $82.17 | $82.17 |
| Gross receipts from over-the-bar sales | $9,120.87 | $15,365.79 | $17,214.62 | $15,735.56 |
| Gross receipts from to-go sales[2] | $1,125.20 | $1,132.00 | $1,224.40 | $1,248.00 |
| Total gross receipts from keg sales | $10,246.07 | $16,497.79 | $18,439.02 | $16,983.56 |

[1]Each keg sold over the bar generated $82.17 in gross receipts, determined as follows:

| Ounces per keg | 1,980 |
|---|---|
| Less:  17%-discretionary use allowance | 336.60 |
| Ounces sold | 1,643.40 |
| Divided by 10 oz. | 10 |
| Number of 10-oz. drafts/keg | 164.34 |
| Multiplied by $0.50/draft | $0.50 |
| Gross receipts/kegs sold over the bar | $82.17 |

[2]Gross receipts were determined by multiplying the total number of kegs sold to go each year by cost plus $5 (i.e., 40 kegs x $28.13 for 1987, 40 kegs x $28.30 for 1988, 40 kegs x $30.61 for 1989, and 40 kegs x $31.20 for 1990).

## Table II  Gross Receipts From Canned Beer Sales

|  | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|
| Individual cans sold over the bar[1] | 9,456 | 7,920 | 6,672 | 21,096 |
| Less: 2 cans/case discretionary use allowance[2] | 788 | 660 | 556 | 1,758 |
| Total cans sold over the bar | 8,668 | 7,260 | 6,116 | 19,338 |
| Multiplied by $1.10[3] | $1.10 | $1.10 | $1.10 | $1.10 |
| Gross receipts from over-the-bar sales | $9,534.80 | $7,986.00 | $6,727.60 | $21,271.80 |
| Gross receipts from to-go sales[4] | $4,394.00 | $4,394.00 | $4,394.00 | $4,394.00 |
| Total gross receipts from canned beer sales | $13,928.80 | $12,380.00 | $11,121.60 | $25,665.80 |

[1]The number of individual cans sold over the bar was determined as follows:

|  | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|
| Total cases purchased | 732 | 668 | 616 | 1,217 |
| Multiplied by 24 cans/case | 24 | 24 | 24 | 24 |
| Total cans purchased | 17,568 | 16,032 | 14,784 | 29,208 |
| Divided by 6 cans/pack | 6 | 6 | 6 | 6 |
| Total six-packs | 2,928 | 2,672 | 2,464 | 4,868 |
| Less: six-packs sold to go | 1,352 | 1,352 | 1,352 | 1,352 |
| Six packs sold over the bar | 1,576 | 1,320 | 1,112 | 3,516 |
| Multiplied by 6 cans/pack | 6 | 6 | 6 | 6 |
| Total individual cans sold over the bar | 9,456 | 7,920 | 6,672 | 21,096 |

[2]The discretionary use allowance was determined as follows:

```
9,456 individual cans ÷ 24 cans/case = 394 cases x 2 cans/case = 788 cans
7,920 individual cans ÷ 24 cans/case = 330 cases x 2 cans/case = 660 cans
6,672 individual cans ÷ 24 cans/case = 278 cases x 2 cans/case = 556 cans
21,096 individual cans ÷ 24 cans/case = 879 cases x 2 cans/case = 1,758 cans
```

[3]$1.10 reflects the price per can sold over the bar.

[4]Gross receipts from to-go sales were determined by multiplying the number of six-packs sold to go each year by $3.25 (i.e., 1,352 six-packs x $3.25 = $4,394).

## Table III  Gross Receipts From Bottled Beer Sales

|                                           | 1987        | 1988        | 1989        | 1990       |
|-------------------------------------------|-------------|-------------|-------------|------------|
| Total cases purchased                     | 5,579       | 4,824       | 4,879       | 2,600      |
| Multiplied by 24 bottles/case             | 24          | 24          | 24          | 24         |
| Total bottles purchased                   | 133,896     | 115,776     | 117,096     | 62,400     |
| Less: 2 bottles/case discretionary use allowance[1] | 11,158 | 9,648 | 9,758 | 5,200 |
| Total bottles sold                        | 122,738     | 106,128     | 107,338     | 57,200     |
| Multiplied by $1.10[2]                    | $1.10       | $1.10       | $1.10       | $1.10      |
| Total gross receipts from bottled beer sales | $135,011.80 | $116,740.80 | $118,071.80 | $62,920.00 |

[1]The discretionary use allowance was determined by multiplying the number of cases purchased by 2 cans/case.

[2]$1.10 represents the price per bottle sold.

## Table IV  Gross Receipts From Wine Sales

|  | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|
| **.750-liter bottles:** |  |  |  |  |
| Number of 6-oz. glasses/bottle[1] | 3.35 | 3.35 | 3.35 | 3.35 |
| Multiplied by number of bottles sold | 23 | 25 | 60 | 143 |
| Total glasses sold | 77.05 | 83.75 | 201.00 | 479.05 |
| Multiplied by $1.10[2] | $1.10 | $1.10 | $1.10 | $1.10 |
| Gross receipts from .750-liter bottles | $84.76 | $92.13 | $221.10 | $526.96 |
| **Liter bottles:** |  |  |  |  |
| Number of 6-oz. glasses/bottle[1] | 3.35 | 3.35 | 3.35 | 3.35 |
| Multiplied by number of bottles sold | 167 | 142 | 269 | 181 |
| Total glasses sold | 559.45 | 475.70 | 901.15 | 606.35 |
| Multiplied by $1.10[2] | $1.10 | $1.10 | $1.10 | $1.10 |
| Gross receipts from liter bottles | $615.40 | $523.27 | $991.27 | $666.99 |
| **1.5-liter bottles:[3]** |  |  |  |  |
| Number of 6-oz. glasses/bottle[1] | 6.70 | 6.70 | 6.70 | 6.70 |
| Multiplied by number of bottles sold | -0- | 96 | 42 | 42 |
| Total glasses sold | -0- | 643.20 | 281.40 | 281.40 |
| Multiplied by $1.10[2] | -0- | $1.10 | $1.10 | $1.10 |
| Gross receipts from 1.5-liter bottles | -0- | $707.52 | $309.54 | $309.54 |
| **3-liter bottles:[4]** |  |  |  |  |
| Number of 6-oz. glasses/bottle[1] | 13.40 | 13.40 | 13.40 | 13.40 |
| Multiplied by number of bottles sold | 24 | 12 | -0- | -0- |
| Total glasses sold | 321.60 | 160.80 | -0- | -0- |
| Multiplied by $1.10[2] | $1.10 | $1.10 | -0- | -0- |
| Gross receipts from 3-liter bottles | $353.76 | $176.88 | -0- | -0- |
| **Total gross receipts from wine** | $1,053.92 | $1,499.80 | $1,521.91 | $1,503.49 |

[1]The number of 6-oz. glasses per bottle was determined as follows:

|  | .750-liter | Liter | 1.5-liter | 3-liter |
|---|---|---|---|---|
| Ounces/bottle | 25.13 | 33.50 | 50.26 | 100.52 |
| Less: discretionary use allowance (20% for .750-, 1.5-, and 3-liter bottles, 40% for liter bottles) | 5.03 | 13.40 | 10.05 | 20.10 |
| Ounces sold/bottle | 20.10 | 20.10 | 40.21 | 80.42 |
| Divide by 6 oz. | 6 | 6 | 6 | 6 |
| Number of 6-oz. glasses/bottle | 3.35 | 3.35 | 6.70 | 13.40 |

[2]$1.10 reflects the price per glass of wine.

[3]One 1.5-liter bottle is equivalent to two .750-liter bottles.

[4]One 3-liter bottle is equivalent to four .750-liter bottles.

## Table V Gross Receipts for Liquor Sales

|  | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|
| Liter bottles |  |  |  |  |
| Number of 1.3-oz. servings/bottle[1] | 21.65 | 21.65 | 21.65 | 21.65 |
| Multiplied by number of bottles purchased | 1,114 | 1,658 | 2,087 | 1,140 |
| Number of 1.3-oz. servings sold | 24,118.10 | 35,895.70 | 45,183.55 | 24,681 |
| Multiplied by $1.15[2] | $1.15 | $1.15 | $1.15 | $1.15 |
| Gross receipts from liter bottles | $27,735.82 | $41,280.06 | $51,961.08 | $28,383.15 |
| .750-liter bottles |  |  |  |  |
| Number of 1.3-oz. servings/bottle[1] | 16.24 | 16.24 | 16.24 | 16.24 |
| Multiplied by number of bottles purchased | 60 | 79 | 12 | 9 |
| Number of 1.3-oz. servings sold | 974.40 | 1,282.96 | 194.88 | 146.16 |
| Multiplied by $1.15[2] | $1.15 | $1.15 | $1.15 | $1.15 |
| Gross receipts from .750-liter bottles | $1,120.56 | $1,475.40 | $224.11 | $168.08 |
| Total gross receipts from liquor sales | $28,856.38 | $42,755.46 | $52,185.19 | $28,551.23 |

[1]The number of 1.3-oz. servings per bottle was determined as follows:

|  | Liter | .750-liter |
|---|---|---|
| Ounces per bottle | 33.50 | 25.13 |
| Less: 16%-discretionary use allowance | 5.36 | 4.02 |
| Ounces sold per bottle | 28.14 | 21.11 |
| Divide by 1.3 oz. | 1.30 | 1.30 |
| Number of 1.3-oz. servings/bottle | 21.65 | 16.24 |

[2]$1.15 reflects the price charged per liquor drink.

Table VI  Gross Receipts--Summary

|                                    | 1987        | 1988        | 1989        | 1990        |
|------------------------------------|-------------|-------------|-------------|-------------|
| Keg beer gross receipts            | $10,246.07  | $16,497.79  | $18,439.02  | $16,983.56  |
| Canned beer gross receipts         | 13,928.80   | 12,380.00   | 11,121.60   | 25,665.80   |
| Bottled beer gross receipts        | 135,011.80  | 116,740.80  | 118,071.80  | 62,920.00   |
| Wine gross receipts                | 1,053.92    | 1,499.80    | 1,521.91    | 1,503.49    |
| Liquor gross receipts              | 28,856.38   | 42,755.46   | 52,185.19   | 28,551.23   |
| Total gross receipts               | 189,096.97  | 189,873.85  | 201,339.52  | 135,624.08  |
| Less: Reported gross receipts      | 84,179.57   | 73,801.36   | 73,865.70   | 104,254.74  |
| Unreported gross receipts          | 104,917.40  | 116,072.49  | 127,473.82  | 31,369.34   |