T.C. Memo. 2007-364

UNITED STATES TAX COURT

FRANK H. AND MARLA C. BLACK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15629-04.                    Filed December 10, 2007.

Frank H. and Marla C. Black, pro se.

<u>J. Craig Young</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined the following
deficiencies in income tax and penalties for petitioners' 1991
and 1992 taxable years:

### Frank H. Black

| Year | Deficiency | Penalty sec. 6662(a) | Penalty sec. 6663 |
|------|-----------|----------------------|-------------------|
| 1991 | $22,904 | n/a | $17,178.00 |
| 1992 | 60,262 | n/a | 45,196.50 |

### Marla C. Black

| Year | Deficiency | Penalty sec. 6662(a) | Penalty sec. 6663 |
|------|-----------|----------------------|-------------------|
| 1991 | $22,904 | $4,580.80 | n/a |
| 1992 | 60,262 | 12,052.40 | n/a |

After concessions, the issues we must decide are: (1) Whether petitioner Frank Black is liable for the fraud penalty pursuant to section 6663[1] for taxable years 1991 and 1992; (2) whether assessment of the deficiencies in income tax and penalties for the taxable years 1991 and 1992 is barred by the statute of limitations; (3) whether petitioners failed to report income of $107,082 and $160,706, respectively, on their 1991 and 1992 joint income tax returns; (4) whether petitioners have substantiated the existence or amounts of any net operating losses for the taxable years 1991 and 1992; (5) whether petitioners have substantiated that they are entitled to capital loss carryover deductions for the taxable years 1991 and 1992 of $3,000 for each year; (6) whether petitioners failed to report interest and dividend income on their 1992 joint return of $3,748 and $35, respectively; and (7) whether petitioner Marla Black is liable for a penalty pursuant to section 6662(a).

---

[1]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code, as amended.

FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated. The parties' stipulations of fact are incorporated herein by reference and are found as facts. Petitioners resided in Rock Hill, South Carolina, at the time the petition was filed.

Petitioners are Frank H. Black (Mr. Black) and Marla C. Black (Mrs. Black). Petitioners were married throughout all relevant periods.

Mr. Black graduated from Michigan State University in 1969 with a Bachelor of Science degree, majoring in sociology and minoring in religion. He was self-employed during 1991 and 1992 as a licensed stockbroker, investment consultant, and insurance agent.

On July 1, 1990, Mr. Black started his own business, Frank Black d/b/a Robert Thomas Securities, which continued to operate throughout 1991 and 1992. On May 18, 1992, Mr. Black formed a North Carolina "C-Corporation", Frank Black, Inc. Respondent has not conducted an examination of Frank Black, Inc., for the taxable year 1992.

Mr. Black maintained his own books and records for 1991 and 1992, but failed to maintain complete and accurate books and records of income and expenses for either taxable year.

Petitioners filed timely joint Federal income tax returns for taxable years 1991 and 1992. Mr. Black prepared a draft of the 1991 joint return and took it to a certified public accountant (C.P.A.) for review. The C.P.A. made some minor corrections, then used the data shown on the draft to create a computer-generated 1991 joint return. The 1992 joint return was prepared by an accountant based upon computer printouts of income and expenses and oral information provided by Mr. Black.

Internal Revenue Service (IRS) Revenue Agent Margaret McCarter (Agent McCarter) was assigned to the examination of petitioners' joint returns for the taxable years 1991 and 1992. Agent McCarter's initial contact with Mr. Black occurred on May 11, 1993, when she mailed him a letter advising him that his 1991 income tax return was being examined and scheduling an appointment for May 24, 1993.

Mr. Black refused to meet with Agent McCarter. As a result, most of Agent McCarter's later contacts were with the representatives to whom Mr. Black delegated powers of attorney.

On May 26, 1994, Agent McCarter referred Mr. Black's case to the IRS Criminal Investigation Division.

On October 18, 1994, IRS Special Agent Dennis O'Dell (Agent O'Dell) and Agent McCarter went to meet with Mr. Black at his place of business in Charlotte, North Carolina. After arriving, they introduced themselves to Mr. Black, and Agent O'Dell

informed Mr. Black why they were there.  As Agent O'Dell began reading him his rights, Mr. Black interrupted him, said the interview was over, and asked them to leave.

Agent McCarter, and later also Agent O'Dell, were forced, because of Mr. Black's refusal to provide requested bank and other relevant records, to serve numerous IRS summonses on Mr. Black, banks, and other third parties in order to obtain the information necessary to determine petitioners' income tax liabilities for the taxable years 1991 and 1992.

During November 1994, Agent O'Dell provided Mr. Black's representatives with a printout of canceled checks and asked them to have Mr. Black classify the purpose of the checks as either business or personal.  Over 3 months later, Mr. Black still had not classified the checks.  On March 4, 1995, Agent O'Dell wrote Mr. Black's representatives, again requesting that Mr. Black classify the checks, and also asked that Mr. Black complete and return the Cash On Hand Statement enclosed with that letter.  On March 15, 1995, Mr. Black's principal attorney, Robert Mendenhall, advised Agent O'Dell that Mr. Black "is being very obstinate" and that he hoped that one of Mr. Black's other attorneys, who was meeting with Mr. Black "can convince him that this is a serious matter".  On the basis of Mr. Black's lack of cooperation, the lack of adequate books and records of income and

expenses, and evidence showing that petitioners had acquired assets and made substantial expenditures, Agent McCarter decided to use an indirect method of proof to reconstruct Mr. Black's income for 1991 and 1992. Agent McCarter ultimately determined that the net worth method would be the most appropriate method to use. Agent McCarter prepared a revenue agent's report setting forth the results of her examination of petitioners' returns for the taxable years 1991 and 1992.

On June 9, 2004, respondent issued a statutory notice of deficiency to petitioners for taxable years 1991 and 1992. In the notice of deficiency, respondent determined petitioners' taxable income for 1991 and 1992 using the net worth method of proof. Respondent determined that petitioners made nondeductible expenditures during taxable years 1991 and 1992 of $108,768.01 and $188,219.01, respectively.

Mr. Black applied for a $250,000 life insurance policy. Mr. Black's business wrote check No. 1908 dated 12/10/92 to First Colony Life Insurance Co. of $318.24 for a $50,000 life insurance policy on Mr. Black.

Respondent's net worth computations treat certain payments made by Mr. Black's businesses during 1991 and 1992 for medical expenses as nondeductible personal expenditures made by petitioners.

Mr. Black wrote a letter as manager of Robert Thomas Securities to Lincoln National Insurance canceling a group medical insurance policy and stating that his business was renewing a group medical insurance policy with Continental Insurance.

Special Agent O'Dell stated in his report that Mr. Black paid a total of $4,371 in health insurance premiums during the period January through July 1991, before terminating the policy.

During 1992, Mr. Black paid the C.P.A. firm of Martinson, Newton & Co., C.P.A.s, a fee of $225 for preparing petitioners' 1991 joint return, and for preparing amended joint Federal and State income tax returns for 1990.

During 1992, Mr. Black paid Bob West a fee of $250 to form Mr. Black's North Carolina C-Corporation, Frank Black, Inc.

The notice of deficiency treated both the $225 income tax return preparation fee and the $250 incorporation fee as nondeductible expenditures for purposes of respondent's net worth computation.

During 1991 and 1992, petitioners made credit card payments totaling $22,796.48 and $20,320.19, respectively, all of which payments were treated as nondeductible in the notice of deficiency.

Petitioners claimed Schedule C, Profit or Loss From Business, deductions on their 1991 joint return for payments of

$3,000 to each of their children Dominique (born on October 27, 1983) and Jonathan (born on May 31, 1985). Petitioners claimed Schedule C deductions on their 1992 joint return for payments of $5,240 made to each of their children Dominique and Jonathan. The notice of deficiency treated the full amounts of the payments by Mr. Black to Dominique and Jonathan during 1991 and 1992 as nondeductible for purposes of respondent's net worth computation.

Mr. Black issued Forms 1099-MISC reporting the payments made to Dominique and Jonathan in 1991 and 1992. Federal and State income tax returns were filed for Dominique and Jonathan for the taxable years 1991 and 1992 reporting the amounts shown on Forms 1099-MISC.

On December 3, 1991, Mr. Black met with C.P.A. Walter Martinson to discuss various aspects of Mr. Black's business. One of the items discussed was the possibility of Mr. Black's paying his children. C.P.A. Martinson advised putting money in an account for them in their names.

During the taxable year 1991, Mr. Black was a general agent for Clark Capital Management Group (Clark Capital) and received commissions from Clark Capital of $21,843.36. Petitioners did not report any of the Clark Capital commission income on their 1991 joint return.

On July 26, 1985, petitioners submitted a consumer loan application to Home Federal (Home Federal application). On the

Home Federal application, they listed under "ASSETS" a "BRADFORD MONEY MARKET" account valued at $9,000. On the "PERSONAL STATEMENT" attached to the Home Federal application, petitioners stated that they possessed "Cash on hand and in banks" totaling $9,000.

IRS Revenue Agent Robin Helton (Agent Helton) was assigned to examine petitioners' joint returns for the taxable years 1987, 1988, and 1989. Petitioners' 1987, 1988, and 1989 income tax returns reported taxable income of $76,332, $44,581, and $26,791, respectively. Petitioners later agreed to deficiencies for taxable years 1987, 1988, and 1989.

On May 8, 1990, Agent Helton conducted an initial interview with Mr. Black in connection with her examination of petitioners for the years 1987, 1988, and 1989. During that interview, she questioned Mr. Black about what was the "most cash you had on hand during the tax year," to which Mr. Black responded that petitioners kept no great amounts of cash on hand. At no time during Agent Helton's investigation did petitioners ever claim to have had large amounts of cash on hand.

On February 18, 1987, petitioners received a check of $69,133.31 from the sale of a residence owned by Mrs. Black, which they deposited into one of their bank accounts during 1987.

On December 31, 1992, petitioners had cash on hand of approximately $60,000 and did not possess cash on hand in any significantly greater amount.[2]

Petitioners were not mistrustful of banks, and they maintained several bank accounts and engaged in large numbers of banking transactions during both 1991 and 1992. Petitioners' use of bank accounts included the unusual practice of depositing and writing numerous checks for small amounts. During 1991 and 1992, petitioners deposited 22 checks ranging from $0.63 to $23.47, and also wrote 38 checks ranging from $2 to $9.93.

Mr. Black knew that bank deposits are insured by the Federal Deposit Insurance Corporation and that he could have earned considerable sums of interest income, with no risk, if he had deposited the alleged cash hoard into a bank account.

Petitioners borrowed money and paid interest on loans during not only 1991 and 1992, but also during prior years when they allegedly were accumulating their cash hoard. Petitioners claimed and respondent allowed, Schedule A, Itemized Deductions, mortgage interest deductions for each of the taxable years 1987 through 1992.

Mr. Black borrowed $9,000 from his office manager, Jeanette Roberts, and repaid her during the same year that the loan was made.

---

[2]The parties stipulated these facts.

Petitioners were unable to estimate, in dollars, the amounts of the alleged cash hoard they contend were expended during either 1991 or 1992.  Petitioners failed to provide any specific details (i.e., dates, amounts, or items purchased) concerning the use of the alleged cash hoard during either 1991 or 1992 for either personal or business purposes.

All of the nondeductible expenditures Agent McCarter took into account in her net worth computation were paid either by check, or by credit card charges later paid by check.

The cash deposits into petitioners' bank accounts totaled $4,500 in 1991, and no cash deposits were made into petitioners' bank accounts during 1992.

Petitioners claimed net operating loss deductions of $19,008 and $29,917 on their 1991 and 1992 joint returns respectively.

Petitioners claimed $3,000 deductions for short-term capital losses on their 1991 and 1992 joint returns.

In the notice of deficiency, respondent determined that petitioners omitted from their 1992 joint return interest income of $3,748 and dividend income of $35 that they received from American Funds Service Company.

Agent McCarter based her adjustments to petitioners' 1992 interest income upon Forms 1099 issued in Mr. Black's name and Social Security number.  None of the Forms 1099 were issued in the name or employer identification number of Frank Black, Inc.

Frank Black, Inc., did not have any bank or other accounts during 1992. Frank Black, Inc., did not conduct any business during 1992. All of petitioners' existing accounts remained in their individual names. All interest paid on petitioners' accounts was earned by petitioners individually.

During the examination conducted for the taxable years 1979 through 1981, Mr. Black refused to discuss the large deductions claimed for alleged contributions to the Universal Life Church (ULC). In addition, he refused to provide any substantiation in order to verify the secretarial expense and the casualty loss claimed on the returns and stated that the agent had no authority to ask any personal questions.

When questioned by Agent Helton during the initial interview for the examination of petitioners' 1987 through 1989 tax years, Mr. Black generally was unresponsive and evasive.

During Agent Helton's initial interview, Mr. Black told her that petitioners had not acquired any assets during the years 1987 through 1989, even though they had acquired assets, including several automobiles.

On their joint returns for the taxable years 1987, 1988, and 1989, petitioners deducted $22,350, $13,125, and $13,250, respectively, for their alleged contributions to "New Faith Baptist Church" (NFBC). Respondent disallowed all of the

NFBC deductions, and petitioners subsequently conceded, pursuant to settlement, that no NFBC deductions were allowable.

During the examination, Mr. Black gave Agent Helton a statement which he stated should be sufficient to verify the deductions claimed for contributions to NFBC. The statement provided by Mr. Black included both the name of the alleged church, listed as "New Faith Baptist, Inc." and the amounts of the alleged charitable contributions. Petitioners never provided any evidence to Agent Helton to show that any church named NFBC actually existed. Agent Helton tried, without success, to verify the existence of NFBC through other means. Agent Helton checked the telephone listing for Rock Hill, South Carolina, and also checked the IRS's official listing of approved section 501(c)(3) organizations, but found no listings for the alleged church.

Because the statement provided by Mr. Black included "Inc." in the alleged church's name, Agent Helton checked with the South Carolina Secretary of State (SCSOS). Agent Helton learned from the SCSOS that a corporation named New Faith Baptist, Inc., was on file with the SCSOS, and that its articles of incorporation listed petitioners' Rock Hill, South Carolina, address as its corporate address, and listed Mr. Black as a corporate officer. During a January 28, 1991, telephone conversation, Mr. Black told Agent Helton that NFBC had moved to Hickory, North Carolina.

Petitioners never provided Agent Helton with any canceled checks or any other credible evidence to show that they had made any contributions to NFBC (or any church) during 1987, 1988, or 1989.

During May 1991, Mrs. Black purchased a new Magic-Chef electric range at Appliance and Furniture World in Charlotte, North Carolina. The range was installed in petitioners' kitchen, was used to cook meals for petitioners' family and their guests, and it was not used for any business purposes. Mr. Black deducted the $839.95 paid for the electric range as "Supplies" on the Schedule C attached to the 1991 joint return.

During February, 1991, petitioners paid $929.10 to Steve Starnes, d.b.a. Steve's Upholstery, for replacing the foam and re-upholstering a sectional sofa. The sofa was kept in the den in petitioners' home, which was used on a regular basis as a family room by petitioners and their children and was not devoted exclusively to business purposes. Mr. Black deducted the $929.10 paid for the sofa re-upholstery as "Supplies" on the Schedule C attached to the 1991 joint return.

During May 1991, Mrs. Black purchased a 75-gallon salt water aquarium from Kent Drum (Mr. Drum), the owner of K&M Pet Center. The aquarium and related equipment were delivered to petitioners' house on the evening of May 29, 1991, and left unassembled in their den. The next day Mr. Drum assembled the aquarium in

petitioners' den.  The aquarium was set up the day before the sixth birthday of petitioners' son, Jonathan.  The aquarium remained in petitioners' den until at least March 6, 1995. Mr. Black deducted the $1,150 paid for the aquarium as "Supplies" on the Schedule C attached to the 1991 joint return.

During 1992, Daniel Howachyn performed alterations on an iron gate and also fabricated an arched door made of treated wood.  Both the gate and door were located in petitioners' residential courtyard.  Mrs. Black paid for the work on the gate with two checks of $425 and $200.  Mr. Black deducted both checks to Mr. Howachyn as "Supplies" on the Schedule C attached to the 1992 joint return.

During both 1991 and 1992, Mr. Black wrote checks to petitioners' daughter, Anita Black, who was attending college at the time.  A summary of these checks is as follows:

| Year | Amount | Stated Purpose |
|------|--------|----------------|
| 1991 | $900 | Supplies |
| 1991 | $438 | Supplies |
| 1992 | $102 | Small overhead projector – supplies |
| 1992 | $375 | Brother processor – supplies |
| 1992 | $400 | Typewriter – supplies |
| 1992 | $500 | Pay |
| 1992 | $500 | Pay |
| 1992 | $300 | Pay |

Mr. Black deducted the foregoing eight checks based on their "Stated Purpose" on the Schedule C attached to the 1991 and 1992 joint returns.  Anita Black never purchased equipment for or sold

any equipment to Mr. Black.  Although Anita Black occasionally did some work for her father's business, she never received a paycheck.  Anita Black did have a Brother processor and typewriter and used them for schoolwork.  Mr. Black did not issue a Form 1099 or Form W-2, Wage and Tax Statement, for the $1,300 allegedly paid to Anita Black as wages during 1992.

For 1991 and 1992, petitioners claimed Schedule C deductions for travel expenses of $43,084 and $18,272, respectively, and claimed Schedule C deductions for meals and entertainment of $29,561 and $14,734, respectively.

For many years, Mr. Black has placed title to his property solely in his wife's name because of his concerns that his property could be reached by potential creditors.

Mrs. Black holds a bachelor of visual arts degree in sculpture.  Mrs. Black did not personally sign the 1991 and 1992 joint returns.  Mr. Black signed Mrs. Black's name to the 1991 and 1992 joint returns.  Mrs. Black did not review, and never saw, the 1991 or 1992 joint returns before they were filed.  She also never asked Mr. Black whether he had timely filed those returns and did not know until well after the fact that those returns had been filed.

OPINION

1.  Period of Limitations and Fraud

We address the issues of fraud and the period of limitations prior to the other issues in the instant case because, absent fraud, the period of limitations prevents respondent's assessment of the taxable years in issue.  Sec. 6501(c)(1); see, e.g. Langworthy v. Commissioner, T.C. Memo. 1998-218.  The notice of deficiency was issued on June 9, 2004, after the expiration of the general 3-year period of limitations on assessments for both petitioners' 1991 and 1992 taxable years.  Sec. 6501(a). However, in the case of the filing of a false or fraudulent return with intent to evade tax, the tax may be assessed at any time.  Sec. 6501(c)(1).  If the return is fraudulent in any respect, it deprives the taxpayer of the bar of the statute of limitations for that year.  Lowy v. Commissioner, 288 F.2d 517, 520 (2d Cir. 1961), affg. T.C. Memo. 1960-32.  "Thus, where fraud is alleged and proven, respondent is free to determine a deficiency with respect to all items for the particular taxable year without regard to the period of limitations."  Colestock v. Commissioner, 102 T.C. 380, 385 (1994).  Moreover, if a joint return was filed, proof of the fraudulent intent as to one spouse lifts the bar of the statute of limitations as to both spouses. Vannaman v. Commissioner, 54 T.C. 1011, 1018 (1970).

The Commissioner has the burden of proving fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b). Respondent's burden of proof under section 6501(c)(1) is the same as that imposed by section 6663.  See Schaffer v. Commissioner, 779 F.2d 849, 857 (2d Cir. 1985), affg. in part and remanding in part Mandina v. Commissioner, T.C. Memo. 1982-34.

A.  Proof of an Underpayment

To satisfy the Commissioner's burden, the Commissioner must show:  (1) An underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).  The Commissioner must meet that burden through affirmative evidence because fraud is never imputed or presumed.  Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).  If the Commissioner establishes that any portion of an underpayment in a particular year is attributable to fraud, the entire underpayment is treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud.  Sec. 6663(b).

Respondent used the net worth method to establish petitioners' income and the fact of an underpayment.  Under the net worth method, taxable income is computed by reference to the

change in the taxpayer's net worth[3] during a year, increased for
nondeductible expenses such as living expenses, and decreased for
items attributable to nontaxable sources such as gifts and loans.
The resulting figure may be considered to represent taxable
income, provided:  (1) The Commissioner establishes the
taxpayer's opening net worth with reasonable certainty, and
(2) the Commissioner either shows a likely source of unreported
income or negates possible nontaxable sources.  United States v.
Massei, 355 U.S. 595, 595-596 (1958); Holland v. United States,
348 U.S. 121, 132-138 (1954); Brooks v. Commissioner, 82 T.C.
413, 431-432 (1984), affd. without published opinion 772 F.2d 910
(9th Cir. 1985).  Deductions are a matter of legislative grace,
and petitioners must prove they are entitled to the deductions.
Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440
(1934).

Respondent has established petitioners' opening net worth
with reasonable accuracy.  Petitioners, however, argue that Mr.
Black maintained a cash hoard and that respondent's determination
of petitioners' opening net worth does not take into
consideration petitioners' cash hoard.  According to Mr. Black,
as of December 31, 1990, petitioners had accumulated a cash hoard
of between $500,000 and $505,000, consisting of bundles of $100

---

[3]Assets are generally listed at their cost rather than at
their current market value.  Camien v. Commissioner, 420 F.2d
283, 285 (8th Cir. 1970), affg. T.C. Memo. 1968-12.

bills, and kept this cash hoard inside a suitcase in an unlocked closet in their residence.

We decide whether a witness is credible on the basis of objective facts, the reasonableness of the testimony, and the demeanor of the witness. Quock Ting v. United States, 140 U.S. 417, 420-421 (1891); Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Dozier v. Commissioner, T.C. Memo. 2000-255. Having had the opportunity to observe petitioners and Mr. Black's employee, Mr. Plexico, at trial, we find their testimony regarding the existence of a cash hoard to lack credibility.

Petitioners had several bank and investment accounts and made regular use of them. We find it implausible that, as a stockbroker and investment adviser, Mr. Black had accumulated $500,000 in cash, and that he kept that cash in a closet at his house.

Respondent repeatedly requested that petitioners provide information about petitioners' cash on hand, but they refused to provide such information. Petitioners and their representatives were aware that respondent was using the net worth method of proof to compute petitioners' taxable income for the taxable years 1991 and 1992. However, at no time during Agent McCarter's civil examination, or Agent O'Dell's criminal investigation, did

petitioners or any of their representatives claim that the net worth adjustments could be explained by the use of a large cash hoard.

Petitioners did not raise any cash hoard defense in either their petition or their reply. Petitioners first raised their cash hoard defense only after this case initially was set for trial in Winston-Salem, North Carolina, on May 23, 2005.

Petitioners have failed to identify any source of funds for the cash hoard other than supposed savings over a number of years. On the July 26, 1985, consumer loan application to Home Federal, petitioners stated that they possessed "Cash on hand and in banks" totaling $9,000. During Agent Helton's examination of petitioners 1987 through 1989 taxable years, petitioners failed to identify any large quantities of cash on hand. At trial, Mr. Black testified that he had lied to Agent Helton.

Furthermore, all of the expenditures in respondent's net worth calculations are by check or credit cards eventually paid by check. Also, there is no evidence of large cash deposits into petitioners' bank accounts. Thus, even if petitioners had a cash hoard, it would not affect the net worth calculations as there is no evidence that any of the expenditures were paid by cash either directly or through deposit and payment by check.

Respondent has negated all nontaxable sources of income alleged by petitioners. Respondent has shown that petitioners did not receive any gifts or inheritances. Most importantly, respondent has negated petitioners' cash hoard argument.

During 1991 and 1992, Mr. Black paid medical insurance premiums of $6,307 and $4,744, respectively. Respondent's net worth calculation treats such amounts as nondeductible expenditures. However, respondent allowed deductions for 25-percent of the premiums paid as self-employment health insurance. See sec. 162(l)(1).

Under section 213(a), personal medical and dental expenses are deductible only to the extent they exceed 7.5 percent of adjusted gross income (AGI). Accordingly, petitioners are not entitled to deduct the remaining 75 percent of the medical insurance premiums paid as personal medical expenses as they do not exceed 7.5 percent of petitioners' adjusted gross income. Secs. 213(a), 162(l)(3)(A). Petitioners have not proven that any deduction above the 25 percent allowed is appropriate.

Petitioners appear to argue that some portion of the medical insurance premiums should be deductible under section 162(a) as ordinary and necessary business expenses. The parties have stipulated that Mr. Black had a health insurance policy covering himself and his family as well as several employees. However, the record is silent as to what portion of the premiums paid was

for petitioners' family and what portion for the employees.
Thus, we are unable to estimate an amount deductible under
section 162(a). See <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544
(2d Cir. 1930); <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743
(1985).

Petitioners challenge several other aspects of respondent's
net worth computation. Many of petitioners' arguments confuse
benefits provided by an employer to an employee with those
provided by a self-employed individual to himself. Additionally,
petitioners attempt to attribute some payments to Frank Black,
Inc. However, Frank Black, Inc., did not have any bank or other
accounts in 1992, nor did it transact any business or have any
employees.

B. <u>Proof That the Underpayment Was Due to Fraud</u>

Section 6663 imposes a penalty equal to 75 percent of the
portion of any underpayment which is attributable to fraud. Sec.
6663(a). The penalty in the case of fraud is a civil sanction
provided primarily as a safeguard for the protection of the
revenue and to reimburse the Government for the heavy expense of
investigation and the loss resulting from a taxpayer's fraud.
<u>Helvering v. Mitchell</u>, 303 U.S. 391, 401 (1938). Fraud is
intentional wrongdoing on the part of the taxpayer with the
specific purpose to evade a tax believed to be owing. <u>McGee v.
Commissioner</u>, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th

Cir. 1975).  The existence of fraud is a question of fact to be resolved from the entire record.  Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).

However, fraud need not be established by direct evidence, which is rarely available, but may be proved by surveying the taxpayer's entire course of conduct and drawing reasonable inferences therefrom.  Spies v. United States, 317 U.S. 492, 499 (1943).  Courts have relied on a number of indicia or badges of fraud in deciding whether to sustain the Commissioner's determinations with respect to the additions to tax for fraud. Although no single factor may be necessarily sufficient to establish fraud, the existence of several indicia may be persuasive circumstantial evidence of fraud.  Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; Beaver v. Commissioner, 55 T.C. 85, 93 (1970).

Circumstantial evidence that may give rise to a finding of fraudulent intent includes:  Understatement of income, inadequate records, failure to file tax returns, concealment of assets, failure to cooperate with tax authorities, filing false documents, failure to make estimated tax payments, engaging in illegal activity, attempting to conceal illegal activity, dealing in cash, implausible or inconsistent explanations of behavior, an

intent to mislead which may be inferred from a pattern of conduct, and lack of credibility of the taxpayer's testimony. Spies v. United States, supra at 499. The taxpayer's background and the context of the events in question may be considered as circumstantial evidence of fraud. Spies v. United States, supra at 497; Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

The instant case involves numerous badges of fraud. Mr. Black grossly understated his income. The 1991 and 1992 joint returns reported negative taxable income of $49,538 and $11,981, respectively. Even after respondent's minor concessions at trial, petitioners failed to report substantial amounts of income, including commissions from Clark Capital of $21,843.36. Petitioners argue that their omission was an oversight on their part because Mr. Black did not receive a Form 1099 from Clark Capital. However, Mr. Black testified at trial that he maintained records of his business gross receipts, that he knew he had received the Clark Capital commissions, and that he had recorded the commission checks in his records. Mr. Black failed to provide such records to his return preparer.

Petitioners' standard of living was inconsistent with the negative income reported on the 1991 and 1992 joint returns. Petitioners hired a housekeeper and paid for their daughter's

college expenses. During the years in issue, petitioners reduced their home mortgage balance from $36,857 to zero and reduced their home equity loan balance from $47,823 to $20,062. In 1992, they also spent a total of $32,299 for improvements to their residence and landscaping.

Mr. Black has a history of refusing to cooperate with respondent's agents. During the examination of his taxable years 1979 through 1981, Mr. Black refused to discuss the large deductions claimed for contributions to the Universal Life Church. During Agent Helton's investigation of taxable years 1987 through 1989, Mr. Black generally was unresponsive and evasive. At trial, while cross-examining Agent Helton, Mr. Black described his own behavior during that audit as "a little evasive".

Finally, during the examination of his taxable years 1991 and 1992, Mr. Black refused to meet first with Agent McCarter and then with both Agents McCarter and O'Dell. Consequently, all of Agent McCarter's and Agent O'Dell's contacts with Mr. Black were made through his representatives. Although the Agents attempted to get Mr. Black to cooperate, he provided only limited records. Mr. Black failed to provide records for the bank accounts that were in his name. Mr. Black refused respondent's repeated requests to classify his checks as either business or personal and to provide information concerning petitioners' cash on hand.

Because Mr. Black refused to provide relevant records, Agents McCarter and O'Dell were forced to serve IRS summonses upon Mr. Black, banks, and other third parties.

Mr. Black's failure to cooperate caused frustration to his own representatives. During November, 1994, Agent O'Dell provided Mr. Black's representatives with a printout of canceled checks and asked them to have Mr. Black classify the purpose of the checks as either business or personal. More than 3 months later, Mr. Black still had not classified the checks. On March 4, 1995, Agent O'Dell wrote Mr. Black's representatives, again requesting that Mr. Black classify the checks, and also asked that Mr. Black complete and return the Cash On Hand Statement enclosed with that letter. On March 15, 1995, Mr. Black's principal attorney, Robert Mendenhall, advised Agent O'Dell that Mr. Black "is being very obstinate" and that he hoped that one of Mr. Black's other attorneys, who was meeting with Mr. Black that "afternoon, can convince him that this is a serious matter".

Petitioners also have a history of claiming inappropriate charitable deductions first to ULC and to NFBC. On their joint returns for taxable years 1979, 1980, and 1981, petitioners claimed deductions for charitable contributions to the Universal Life Church of $59,182, $57,181, and $33,629, respectively.

After examination, respondent disallowed these deductions in full. Petitioners ultimately agreed to the disallowance of all claimed ULC deductions.

Likewise, petitioners claimed charitable deductions on their 1987, 1988, and 1989 joint tax returns of $22,350, $13,125, and $13,250, respectively for contributions to NFBC. After examination, respondent disallowed the NFBC deductions in full. Petitioners ultimately agreed to the disallowance of all claimed NFBC deductions.

During the examination, Mr. Black gave Agent Helton a statement which he stated should be sufficient to verify the deductions claimed for contributions to NFBC. The statement provided by Mr. Black included both the name of the alleged church, listed as "New Faith Baptist, Inc.", and the amounts of the alleged charitable contributions.

Petitioners never provided any evidence to Agent Helton to show that NFBC was a church. Agent Helton tried, without success, to verify the existence of NFBC through other means. Agent Helton checked the telephone listing for Rock Hill, S.C., and also checked the IRS's official listing of approved section 501(c)(3) organizations, but found no listings for the alleged church.

Because the statement provided by Mr. Black included "Inc." in the alleged church's name, Agent Helton checked with the

SCSOS.  Agent Helton learned from the SCSOS that a corporation named New Faith Baptist, Inc., was on file, and that its articles of incorporation listed petitioners' Rock Hill, South Carolina, address as its corporate address and listed Mr. Black as a corporate officer.

At trial, Mrs. Black testified that she first became aware of NFBC "when someone called me on the phone and asked to speak to somebody from the church".  Mrs. Black also testified that after the call she asked Mr. Black about NFBC and "he said [it] used to be in the house; it used to be a church that he and his friends had formed, and it was not valid".  After Mr. Black's objection, Mrs. Black altered her testimony saying: "what I was saying is it was not there in the home anymore."  Petitioners never provided Agent Helton with any canceled checks or any other credible evidence to show that they had made any contributions to NFBC (or any church) during 1987, 1988, or 1989.

Petitioners claimed a number of inappropriate deductions for personal expenditures for the years in issue, including, but not limited to, a new range, re-covering a sofa, an aquarium, and the work performed by Daniel Howachyn.  Petitioners argue that such deductions were for their home office or Mrs. Black's home-based business.  However, at trial, they testified repeatedly that the office was, in fact, their den and was not used exclusively for business purposes.

Section 280A(a) provides as a general rule that no deduction otherwise allowable to an individual "shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence."  As relevant herein, section 280A(c)(1) provides that the general rule of section 280A(a) is not applicable to any item to the extent it is allocable to a portion of the dwelling unit which is exclusively used on a regular basis as the principal place of business for any trade or business of the taxpayer, or as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business.  Expenses deducted as a business use of home must be deductible under section 162 or some other Code section.  See sec. 280A(a).

Petitioners claimed Schedule C deductions for eight checks written to their daughter Anita.  We conclude, largely on the basis of Agent O'Dell's interview with Anita on September 6, 1995, that such checks to Anita were gifts of money and supplies for her college work.  The checks to Anita were not properly deductible as business expenses.

Petitioners also claimed Schedule C deductions on their joint 1991 and 1992 returns for payments to their two young children, Dominique and Jonathan.  Petitioners contend that

Dominique and Jonathan were Mr. Black's employees and the payments to them were properly deducted as salary.

The record establishes that Dominique and Jonathan did spend some time in Mr. Black's office in Charlotte. Likewise, Ms. Roberts, an employee of Mr. Black, told Agent O'Dell that the children sometimes helped her "stuff and stamp" envelopes and perform other chores like emptying the trash. However, we are not persuaded that amounts paid to petitioners' children were compensation for services rendered.

Petitioners failed to present any records to substantiate that he employed Dominique and Jonathan throughout 1991 and 1992, and admitted that they kept no written records of the hours they worked. When asked at trial to estimate the total hours each child worked, Mr. Black answered: "let's call it 1,000 hours per year." According to his estimate, Mr. Black's children, who were 6 and 8 years old in 1991, worked the same hours as one full-time adult.

Mr. Black did not pay the children for services rendered. His actual employee, Ms. Roberts, received a set annual salary, plus a bonus, and was paid by check twice per month. Mr. Black properly withheld Social Security and income taxes from her pay, and issued a Form W-2 reporting her wages. No Forms W-4, Employees Withholding Allowance Certificate, were ever executed for Dominique and Jonathan, no Social Security or income taxes

were withheld, their pay was reported on a Form 1099, and the 1991 salary was paid in a lump sum to each. We conclude that respondent properly treated the payments to Dominique and Jonathan as nondeductible personal expenditures and indicia of fraud.

Petitioner overstated deductions for travel, meals and entertainment expenses and failed to provide credible evidence to support such deductions at trial. During the examination of petitioners' taxable years 1991 and 1992, petitioners' representative provided Agent McCarter with a travel log prepared by Mr. Black which purported to show Mr. Black's business travel for taxable years 1991 and 1992. Agent McCarter returned the log to petitioners' representative because she could not read Mr. Black's handwriting and requested a legible copy of the log or other documentation to support Mr. Black's deductions. Neither Mr. Black nor his representatives ever provided a new travel log or any other evidence to support his deductions for business travel, meals, or entertainment.

Agent McCarter concluded that, on the basis of the amounts of claimed travel deductions and Mr. Black's use of the standard mileage rate, Mr. Black had to have driven 156,669 miles in 1991 and 181,692 miles in 1992, which averages 429 miles per day in

1991 and 498 miles per day in 1992.[4]  At an average rate of 60 miles per hour, Mr. Black would have had to drive between 7 and 8 hours per day, 7 days per week,[5] not including time spent stopped for gas or meals, or meeting with clients.

At trial, both petitioners testified that Mr. Black "loved to drive".  Petitioners argue that Mr. Black's business was just starting up and client contact was very important.  However, petitioners failed to identify even one instance of any business-related travel for either year in issue by destination or name of client.  Additionally, the original travel log is now missing and is not part of the record.

Mr. Black may have traveled for business purposes.  However, we are convinced that the deductions for travel claimed on the 1991 and 1992 joint returns are grossly overstated.  We find that such overstatements are indicative of Mr. Black's fraudulent intent to avoid taxes.

Petitioner is an intelligent and well-educated businessman. We find that he had a basic comprehension of Federal tax matters and he understood that individuals must report their gross income and can only claim deductions for amounts actually paid in the ordinary and necessary course of business, and not for personal expenditures.

---

[4]156,669/365 = 429.23; 181,692/365 = 497.79

[5]429/60 = 7.15; 498/60 = 8.3

Mr. Black attempted to conceal assets by placing title to the assets in his wife's name. At trial, Mr. Black testified that he placed title to property solely in his wife's name so that his creditors would not be able to reach it.

Finally, petitioners provided implausible or inconsistent explanations to explain the discrepancy in the net worth calculations; namely, that they had a cash hoard of $500,000. As discussed above, we do not find any of the testimony presented regarding the cash hoard to be credible.

## C. Conclusion

We conclude that the record shows by clear and convincing evidence that petitioners understated their income and overstated deductions and that there are sufficient badges of fraud to show that understated income and overstated deductions are due to Mr. Black's fraudulent intent. Petitioners have failed to prove any portion of the underpayment is not attributable to fraud. Accordingly, we hold that section 6501(a) does not bar the assessment and collection of taxes for 1991 and 1992 and that Mr. Black is liable for the fraud penalty pursuant to section 6663.

## 2. Amount of the Deficiency

Although petitioners conceded some unreported gross income, petitioners did not concede the deficiencies determined by respondent. Petitioners contend they are entitled to a number of adjustments to gross income not allowed by respondent.

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a)(1); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Some of petitioners' contentions are addressed above in the discussion of fraud and do not bear repeating here, except that we conclude that petitioners have failed to prove respondent's adjustments are not correct. Accordingly, we uphold respondent's determination with respect to those adjustments; i.e., the Schedule C adjustments, the payments to petitioners' children, and the travel adjustments. The remaining contested items are addressed below.

In the notice of deficiency, respondent disallowed a net operating loss deduction for petitioners' taxable years 1991 and 1992. Section 172(a) allows a "net operating loss deduction" for the aggregate of net operating loss carrybacks and carryovers to the taxable year. The term "net operating loss" (NOL) is defined in section 172(c) to mean the excess of deductions allowed by chapter one over gross income. Section 172(b)(1)(A) generally provides that the period for an NOL carryback is 3 years and that the period for an NOL carryover is 15 years.

However, a taxpayer may elect to relinquish the carryback period with respect to an NOL for any taxable year, thereby using the loss to offset income only in future years. Sec. 172(b)(3).

Respondent does not dispute that petitioners elected to relinquish the carryback periods for 1990 and 1991 and apply the NOLs against income for 1991 and 1992.  Respondent, however, argues that petitioners have failed to show that they incurred any NOL in either 1990 or 1991.  Deductions are a matter of legislative grace, and petitioners must prove they are entitled to the deductions.  Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Petitioners were audited for the taxable years 1987, 1988, and 1989, and later resolved their Tax Court cases[6] for those years by agreeing to deficiencies in income tax and related additions to tax for all 3 years.  Additionally, the settlement establishes that petitioners did not incur any NOLs in any of those years, and that no NOL carryover deduction from any pre-1987 taxable year existed to be carried forward.  Thus, petitioners' entitlement to any NOL carryover deduction for taxable years 1991 and 1992 depends solely on whether they have substantiated both the existence and amount of any NOL for 1990 or 1991.

Petitioners argue that their 1990 return shows an NOL of $19,008, and that, by not examining petitioners' 1990 taxable year, respondent has conceded the NOL and cannot disallow it now. Petitioners' argument is without merit.  Respondent's failure to

---

[6]Docket Nos. 10472-91 and 1615-92.

audit or disallow a loss claimed on a return for one year does not estop respondent from disallowing an NOL carryover of that loss to a future year. <u>Rollert Residuary Trust v. Commissioner</u>, 80 T.C. 619, 636 (1983), affd. on another issue 752 F.2d 1128 (6th Cir. 1985). Petitioners have failed to substantiate the existence or amount of any NOL carryover deduction for the taxable years 1991 and 1992.

Under section 1211(b), noncorporate taxpayers are allowed capital losses only to the extent of capital gains plus $3,000. Section 1212(b) allows noncorporate taxpayers to carry forward capital losses to subsequent taxable years, but it does not allow such taxpayers to carry back capital losses to prior taxable years.

In the notice of deficiency, respondent disallowed capital loss deductions for petitioners' taxable years 1991 and 1992 of $3,000 and $2,721, respectively. Petitioners advance essentially the same estoppel argument as with the NOL carryover. Petitioners, however, claim the capital losses carried over to 1991 and 1992 arose in taxable years 1981 through 1983 and that deductions of those losses were subsequently allowed in the audited years 1987 through 1989. Petitioners argue that by allowing the loss in the audited years, respondent has conceded the full capital loss carryover amount shown on the returns for 1991 and 1992.

Each taxable year stands alone, and the Commissioner may challenge in a succeeding year what was condoned or agreed to in a former year. Auto. Club of Mich. v. Commissioner, 353 U.S. 180 (1957). A settlement agreement is binding only with respect to the years specified by the agreement. Goldman v. Commissioner, 39 F.3d 402, 405-406 (2d Cir. 1994), affg. T.C. Memo. 1993-480. Petitioners have failed to substantiate that they are entitled to claim any capital loss deduction for the taxable year 1991 or a capital loss in excess of $271 for taxable year 1992.[7]

In the notice of deficiency, respondent determined that petitioners failed to report interest and dividend income on their 1992 joint return of $3,748 and $35, respectively. Gross income includes all interest and dividends received by a taxpayer during the taxable year. Sec. 61(a)(4).

Petitioners argue that they reported $754 of interest on the 1992 income tax return filed by Frank Black, Inc. However, all interest at issue appears on Forms 1099 issued to Mr. Black in his individual name and Social Security number. At trial, Mr. Black indicated that he had assigned that income to the corporation.[8] The assignment of income doctrine prevents

---

[7]Respondent allowed a capital loss deduction of $271 for taxable year 1992.

[8]We note that Frank Black, Inc., had no checking or other accounts in 1992 and does not appear to have carried on any operations.

petitioners from avoiding taxation on their interest income by assigning that income to another.  Lucas v. Earl, 281 U.S. 111 (1930).

Petitioners failed to present any evidence regarding the $35 of dividend income.  Accordingly, we conclude that petitioners failed to report interest and dividend income on their 1992 joint return of $3,748 and $35, respectively.

3.  Section 6662(a) Penalty

Pursuant to section 6662(a), a taxpayer may be liable for a penalty of 20 percent of the portion of an underpayment of tax attributable to a substantial understatement of income tax or due to negligence or disregard of rules or regulations. Sec. 6662(b).  The term "understatement" means the excess of the amount of tax required to be shown on a return over the amount of tax imposed which is shown on the return, reduced by any rebate (within the meaning of section 6211(b)(2)).  Sec. 6662(d)(2)(A). Generally, an understatement is a "substantial understatement" when the understatement exceeds the greater of $5,000 or 10 percent of the amount of tax required to be shown on the return. Sec. 6662(d)(1)(A).  The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code.  Sec. 6662(c).

Mrs. Black is not liable for the accuracy-related penalty imposed by section 6662(a) because the underpayments of tax for taxable years 1991 and 1992 are due to fraud by Mr. Black.  Sec. 6662(b); Zaban v. Commissioner, T.C. Memo. 1997-479; Aflalo v. Commissioner, T.C. Memo. 1994-596; Minter v. Commissioner, T.C. Memo. 1991-448.

We have considered all of petitioners' contentions, and, to the extent they are not addressed herein, they are irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered under Rule 155.